# SUPREME COURT OF LOUISIANA,

##### IN THE

### EASTERN DISTRICT, AT NEW ORLEANS, COMMENCING, APRIL, 1842.

~~~~~~~~~~~~~~~~~~~~~~~~~~

##### PRESENT:

Hon. FRANÇOIS XAVIER MARTIN,
Hon. HENRY A. BULLARD.
Hon. ALONZO MORPHY.
Hon. EDWARD SIMON.
Hon. RICE GARLAND.

~~~~~~~~~~~~~~~~~~~~~~~~~~

MAGDELAINE MICHELLE BONNEAU v. BENJAMIN POYDRAS.

Where in an action by a married woman, defendant excepts on the ground that plaintiff was not authorized by her husband or by a court, the only effect of the exception, if sustained, is to require the plaintiff to exhibit her authorization before proceeding farther with the case. It is immaterial at what time such authority may be obtained and produced, provided it be before the trial of the case on its merits. C. P. 320, 321.

Foreign laws must be proved as facts. In the absence of proof of what they are, our own laws must govern.

A married woman, separated in bed and board, may, under the laws of this state, sue without the authorization of her husband or a court. Proof of the existence of the judgment of separation, is all that is requisite to establish her authority. C. C. 125, 2410. Act of 1 April, 1826, § 2.

Where the rights of a party to a succession, consist only in a right to a portion of the proceeds of the sale of the property, either in money, or in notes given for the price,

# NEW ORLEANS,

it will be considered purely movable ; and this, though the notes should be secured by mortgage on the real estate sold.  C. C. 466, 467.

The provision of art. 463, of the Civil Code, making an action for the recovery of an entire succession, an immovable, relates only to the action given to the heir to recover an entire succession in kind, such as it existed at the time it was opened. It does not apply to an universal legatee, or legatee under an universal title, limited to claiming the movable part of a succession, or a portion of the residue thereof, and not entitled to take possession of the estate in kind, in the condition in which it was at the opening of the succession.

The capacity to dispose of real property must be determined by the *lex rei sitæ.*

Under art. 2410 of the Civil Code, a wife, separated in property, may dispose of her claim to a portion of the proceeds of the sale of the property of a succession, without the consent of her husband.

The power to sell or compromise, must be express and special.  C. C. 2966.

The partial execution of an obligation against which an action of nullity, or recession would lie, subsequently to the period at which it might have been validly confirmed or revoked, if voluntary, is a tacit confirmation.  C. C. 2252.

One who is notified that a contract has been made for him, subject to his ratification, by another pretending to have authority for that purpose, will be presumed to have ratified it, unless he repudiates it immediately after being notified thereof.

APPEAL from the District Court of Pointe Coupée, *Nicholls*, J.

Magdelaine Michelle Bonneau, a married woman, separated from bed and board, and in property, residing in Nantes, in France, represents that she is a niece and one of the heirs of Julien Poydras, who died in this state, in 1824, leaving a will by which he gave the residue of his estate, after the payment of certain legacies, to his nephews and neices. That the succession consisted of real and personal property in this state, and in New York. That the executors had sold a greater part of the estate. That from an account of their administration rendered by them, in the year 1837, it appeared that they had received $1,297,845 40, of which sum $806,780 22 had been paid, in unequal portions, to the heirs of the deceased. That it appears from the accounts of the executors that certain real estate in the cities of New Orleans and New York, a plantation in the parish of St. Bernard with the slaves attached thereto, and other property, remain unsold. That no partition or settlement of the succession has ever been made. That the portions of the different heirs have never been judicially determined. That the defendant, Benjamin Poydras, one of the heirs, took possession of the unsold property and other effects of the succession, immediately after the executors had rendered their ac-

counts as above mentioned. That he has continued ever since to enjoy the fruits and revenues thereof, and to collect the debts due thereto, without having rendered any account. That he received a balance in money, and a large amount of notes, &c., due to the estate, of which he has rendered no account. That the defendant claims to be the owner of the share of the succession belonging to the petitioner, in virtue of a compromise entered into between him and Pelagie Marie Mourain, petitioner's sister, before a notary, in the city of New Orleans, on the 14th July, 1829, by which the latter undertook for herself, and as the agent of the petitioner, to transfer to the defendant, her own and the petitioner's share in the succession of their uncle, and that he also relies on an alleged ratification of the compromise by the petitioner, in certain letters subsequent thereto. The plaintiff alleges that at the date of the compromise and of the letters, she had not been separated in bed and board from her husband ; that her sister had no authority from her to make any such agreement, and that she herself had never been authorized either by her husband or by any court of justice to make such a compromise, or to ratify it ; and that the title of the defendant is, therefore, null. She prays that the agreement may be rescinded ; a partition of the succession decreed ; an inventory and appraisement of the remaining property ordered ; and the defendant condemned to render an account of the money and other property received by him.

The defendant denied, generally, the allegations of the petition, and particularly plaintiff's right to institute the suit ; alleged that since the compromise of the 24th July, 1829, she had ceased to have any claim upon the succession of her uncle ; that P. M. Mourain had been fully authorized to execute the act of compromise ; that the act had been since approved by the plaintiff, and was highly advantageous to her. That if the court should be of opinion that the plaintiff had no authority to execute, or to ratify the compromise, the parties should be restored to the condition in which they were before its execution. That at the sale of the effects of the late Julien Poydras, on the 14th of March, 1825, P. M. Mourain purchased property, for herself and the plaintiff, jointly, to the amount of $128,000, for which she gave four notes for $32,000 each, payable at one, two, three and four years, from the

18th March, 1825, secured by a mortgage importing a confession of judgment, on the property so purchased. That the purchase was subsequently ratified by the petitioner, who has never paid any portion of the price; and that her inability to do so was one of the causes which led to the execution of the compromise and the transfer of her own and her sister's rights in the succession of Julien Poydras to the respondent. That in consideration thereof, the petitioner and her sister were released from all debt to the succession for the said purchase, and the mortgage reserved thereon to secure the price was raised. That since the purchase the petitioner has caused her share thereof to be separated from her sister's, and has disposed of a part of it. That in case the compromise should be set aside, the respondent, as one of the heirs of Julien Poydras, and the representative of the rest, will be entitled to enforce the mortgage given to secure the price of the property sold to the petitioner and her sister. The respondent prays that the compromise may be declared valid, and the petition dismissed with costs; but in case it should be annulled, that the petitioner may be condemned in reconvention to pay him the sum of $64,000, her share of the price of the property purchased, with legal interest from the maturity of the notes given for the price; and that the property may be declared subject to the vendor's privilege; and for general relief.

The evidence establishes that Julien Poydras died in 1824, leaving an olographic will, by which, after a number of special legacies, he bequeaths the residue of his property of every kind whatsoever, of which he may die possessed, to his nephews and nieces, in equal portions. He directed all his landed estate and slaves, not specially bequeathed, to be sold within three months after closing the inventory of his succession, at one, two, three, and four years credit; and that the legacies should be paid at the end of five years from the time of his death, until which time his executors were to retain the seisin; recommending to them, however, to pay the particular legacies, *only*, sooner, should there be funds to do so.

Soon after the death of Poydras, Pelagie Marguerite Mourain, one of his nieces and legatees by universal title, arrived in this state, the bearer of a power of attorney from the plaintiff, another

niece and legatee, dated the 18th of September, 1824. She sub-sequently received another power of attorney, dated the 27th September, 1827. It is admitted that the plaintiff was separated in property from her husband prior to 1825. On the 23d July, 1833, a judgment was rendered separating her from bed and board.

At the sale of the property of the testator, on the 14th March, 1825, P. M. Mourain, purchased for herself and the plaintiff, a plantation, with 143 slaves, in the parish of Pointe Coupée, for $128,000, for which she gave four notes, payable at one, two, three, and four years from the day of sale. The payment of these notes was secured by a special mortgage on the property itself, and on her own and the plaintiff's interest in the succession of their uncle. It was also stipulated, that the executors should retain these shares *à valoir au montant desdits billets et en compensation d'iceux ;* that the purchasers should not alienate any portion of the property to the prejudice of the mortgage ; and that if any of the notes should remain unpaid at maturity, the purchasers might be compelled to pay jointly and severally, and the plantation be seized and sold. This purchase was subsequently ratified by the plaintiff.

Several suits grew out of difficulties to which the settlement of the succession gave rise. The plaintiff and P. M. Mourain were made parties to an action commenced before the Court of Probates of Pointe Coupée, by the other legatees by universal title, against the executors. On the 25th of April, 1827, a rule was entered by consent, by which it was stipulated that the executors should file an account within fifteen days, and deliver to the plaintiffs in the suit a plantation at Terre aux Bœufs, which had been sold by the testator on a credit, and had since been taken back by the heirs under a compromise with the purchasers, and pay over the balance in their hands. The executors were, at the same time, discharged. The executors filed an account on the 16th of August following, and on the 18th of the same month delivered to the defendant, who represented nine of his co-legatees, $20,675 in cash, the plantation at Terre aux Bœufs, a house in the city of New York, and the notes and accounts belonging to the succession. On the 5th of January, 1828, another suit was commenced before the Probate Court by the same plaintiffs, for the purpose of obtain-

ing a sale of the remaining property of the succession, which was ordered by that court to be sold for cash; but on appeal, a judgment was rendered by consent, in the Supreme Court, on the 6th April, 1829, authorizing the plaintiffs to take the plantation at Terre aux Bœufs for their own account, at $130,000 cash. On the 12th of February, 1829, Guy Richard, as purchaser of the share of one of the legatees, and as depositary of the share claimed by a grand-niece of the testator, filed a petition in the Probate Court, praying for a provisional partition of the estate, and, among other things, that the present plaintiff, and her sister, P. M. Mourain, might be compelled to bring into the mass the large balance due on their purchase, after deducting their shares in the succession, for which they were jointly and severally bound. On the 24th of July, 1829, while this action was pending, P. M. Mourain, in her own name, and in that of the plaintiff, entered into a compromise with the defendant, Benjamin Poydras, by notarial act, by which, on transferring to the latter all their rights to the succession of the deceased, Poydras undertook to procure them a release from the payment of the price of the plantation purchased by them. The object of the present suit, is to set this compromise aside, on the ground that the plaintiff was not duly authorized to make it, either by her husband, or by a court of justice.

There was a judgment below in favor of the plaintiff. The act of compromise was ordered to be cancelled, a partition of the succession to be made, and the claim in reconvention dismissed. From this judgment, the defendant took an appeal, which was before the court in March, 1839, (13 La. 177.) The case having been remanded, to enable the parties to prove the authorizations under which they claimed, the plaintiff produced an authorization from the *Tribunal de Premiere Instance*, at Nantes, empowering her to carry on the present suit. The defendant objected to the introduction of this evidence, on the ground that the authorization was granted subsequently to the institution of the suit: that it could have no retroactive effect; that the proceedings previous to its production were consequently void; and that the existing suit should have been dismissed, and a new one commenced. These objections having been overruled, the case was tried anew,

and a second judgment rendered in all respects similar to the first, from which the defendant is appellant.

*R. N. Ogden* and *A. N. Ogden* for the plaintiff. In the decision previously rendered in this case, the court settled the following points :

1. That the capacity of the plaintiff, a married woman, residing in France, was to be determined by the laws of her domicil.

2. That the property embraced in the transaction of 24th July, 1829, was immoveable, and that an authorization to the wife was necessary.

3. That by the laws of France the voluntary execution of the act, after the separation from bed and board, could not be opposed to her, because her incapacity continued until the dissolution of the marriage.

The court then proceeded to inquire whether the plaintiff was ever authorized to make the transaction, or to execute it after it was made, or whether there was any act, either before or after the contract, from which such authorization would result. The conclusion was that no evidence of such authorization was to be found, and the court would have decided in favor of the plaintiff, but that the plaintiff herself had shown no authority to institute the suit, as required by the laws of her domicil. The case was, accordingly, remanded " to enable the parties to make proof of the various authorizations under which they claim."

The authority to enable the plaintiff to stand in judgment, has since been obtained, and will have the same effect as if obtained before the institution of the suit. 4 La. 259. The exception could only compel the plaintiff to produce her authorization before proceeding farther. Code Pract. 321.

The plaintiff having shown that she was separated from bed and board from her husband in 1833, was fully competent, by our laws, to sue without any authorization. The *lex fori* must govern as to the remedy, and in a suit involving the title to property in this state, if the plaintiff has, by our laws, the capacity to sue, the judgment would be binding on her, though incapable by the laws of her domicil. Story, Conflict of Laws, 468, 473.

The transaction required an authorization, though it should be considered to have been an alienation of moveables only. Civ.

Code, art. 2410. Pailliet, p. 379, note C. No. 4 to art. 1449. Civ. Code, art. 125. Code Nap. 217. Sirey, p. 56, 5 and 7. Note to art. 217.

The transaction, if viewed as an act of partition, involved the alienation of immoveables as well as of moveables, and was null for want of authorization. Merlin, Questions de Droit, Partage, § 3, p. 632. Toullier, tit. 1, chapter 6, des Successions, 4 vol. 409.

The wife cannot accept a succession without being authorized. Civ. Code, 998, 999. Toullier, 2 vol. p. 20. 6 Pothier, p. 14. Nor institute or defend a suit for the partition of the estate, and without such authorization she could not make a partition of a succession embracing immoveable property. Toullier, 4 vol. No. 408, p. 409.

Until the dissolution of the marriage, she is expressly prohibited from alienating her immoveable property without the authorization of her husband, or in default of it, the authorization of the judge. Civ. Code, arts. 2410, 2412.

When separate in estate, she can only alienate her moveables in the regular course of administration. Pailliet, p. 379, note 6 to art. 1449.

The sale of the undivided share of the plaintiff in the succession of her uncle, J. Poydras, was the sale of an immoveable. Civ. Code, art. 462. 463.

*L. Janin* and *Mazureau*, for the appellant. This case is to be examined as if brought up for the first time. Nothing was determined by the former decision, but the exception of the defendant to the plaintiff's right of action; and the remarks thrown out by the court concerning the controversy between the parties, were simply *obiter dicta*, and probably attended to with the less care, as the merits were not then properly before the court, and it was evident that the plaintiff was bound first to show her right to appear in court, before the merits of her claim could be investigated.

This case cannot be decided by the laws of France, because they are not in evidence. 12 La. 465, 589. 7 La. 539. 5 Mart. N. S. 176, 254, 270. 4 Mart. N. S. 419. 3 La. 358. 3 Mart. N. S. 149. 1 La. 255. 2 La. 154. 3 La. 36. 4 La. 382.

The difference between the French law and that of this state,

as applicable to this case, is that by the former, a woman separated from bed and board has not the right of disposing of her *immoveable property*, nor, consequently, of ratifying by a voluntary execution a previous illegal alienation thereof, unless she be specially authorized by her husband or by the court, while by the law of this state no such authorization is required. It would be contrary to the policy of this state, and an unusual stretch of the comity of nations, to apply to a contract made here a disability not known to our law. Story, Conflict of Laws, 363. Ib. 366, note, and 390. 1 La. 254. 2 Mart. N. S. 98. 4 Mart. N. S. 2. 8 Mart. N. S. 221. 7 Mart. 709. Story, Conflict of Laws, 154, 156, 126, 73, 75. Civ. Code, 125. Code Pract. 106.

Admitting, for a moment, that M. Bonneau could not have made the compromise without the authorization of her husband or of a court, the question arises whether she was so authorized?

The authorization granted to her by the tribunal of her residence, is recited in her two powers of attorney to P. M. Mourain. That of 1824 contains these clauses: "*procéder à tous comptes, liquidation, et partage de ladite succession,*" &c., "*et généralement faire tout ce que la mandataire verra bien être dans l'intérêt de la comparante, quoique non expressément prévu aux présentes toutes les fois que ce qu'elle fera, tendra à la liquidation, partage, &c.*" That of 1827 approves the purchase of the plantation, authorizes M. Mourain to sue in all cases, to pay all accounts, &c.

The plaintiff, therefore, had the amplest power to proceed to the settlement and partition of the estate. A suit for a partition was pending when the compromise was made; and a married woman, thus authorized, can pass all sorts of acts which will complete the partition. Merlin, Répert. Autorization Maritale, Sect. 8, No. 4. That a sale between co-heirs is always to be considered as a partition, and subject to the same rules, has been decided in *Duplantier* v. *St. Pé*, 3 Mart. 155 and 138, and in a case in 11th Mart. 443.

The second power approves the purchase, and consequently all the obligations assumed by M. Mourain in the plaintiff's name, in the act of purchase. By that act the two purchasers were bound jointly and severally, not only to pay the price of $128,000,

but its payment was secured by a mortgage, and by a pledge of their shares in J. Poydras' estate.

The plaintiff has ratified the compromise by voluntarily executing it. Civ. Code, art. 2252. Her attorney, in fact, Delamarre, sold her undivided half of twenty-two slaves at auction, under a power of attorney, which authorized him to ˉsell, and which was given by the plaintiff under a decree of court.

She afterwards instituted an action for the partition of the plantation purchased for her, and on the 30th of April, 1834, after her separation from bed and board, her attorney in fact executed an act of partition in kind. This sale and partition would have been impossible, had the mortgage reserved on the sale to herself and sister not been raised, which was done by the defendant in pursuance of the stipulations of the compromise. The plaintiff also approved in 1835, an account which contained several charges connected with, and arising out of, the compromise.

Whether an imperfect act be void *ipso jure*, or only voidable, a distinction which, according to Duranton, vol. 13, p. 303, no longer exists, though maintained by other writers, it will be equally ratified by voluntary execution. Merlin, Questions de Droit, *verbo* Mineur, § 3. 8 Toullier, Nos. 510, 511. Merlin, Répert. *verbo* Ratification. 2 La. 520. 7 Mart. N. S. 143. 4 Mart. 78. Even a partial execution will amount to a ratification. 13 Duranton, 295. Should the plaintiff pretend that she did not know the contents of the act thus ratified, she will be bound to prove that she was ignorant of it. 8 Toullier, No. 519.

No particular form is required for the ratification of acts done by mandatories. Art. 2252 (the same as art. 1338 of the Code Nap.,) refers only to obligations. Its dispositions are not repeated in art. 2979, (the same as art. 1998 of the Code Nap.) 13 Duranton, No. 265. 18 Duranton, No. 258. 3 Delvincourt, 243, note 5.

But the plaintiff was competent to execute the compromise, for she was then separated in property, and the compromise was only a sale of moveables. Civ. Code, art. 2410; see also Civ. Code, 466, 467, 470, and the French Civ. Code, art. 1449. 2 Duranton, 449. 14 Duranton, 563. 2 Toullier, 20. 1 Favard, 254. 19 Dalloz, 502. Jurisprudence du XIX Siècle, année 1827, vol. 2, 296;

année 1833, vol. 2, 371. Merlin, Répert. *verbo* Biens, § 1, No. 13. Voet, Comm. ad Pandect, lib. 2, tit. 8, No. 27.

The legatees had no right, by the testament, to the immovea bles ; they were to be sold by the executors. It was only a portion of the price that the testator bequeathed to them. All the property was thus sold before the compromise, except a house in New York subject to a life estate. The plaintiff's right to dispose of her share in this house, must be tested by the law admitted to prevail in New York. The capacity to dispose of real property is determined by the *lex rei sitæ*. This, according to Story, Conflict of Laws, 363, is the established doctrine. In New York a married woman may dispose of her separate estates, as if she were a *feme sole*. 5 Wheeler's Abridgment, 563. 17 Johnson's Rep. 548, (577.)

But it is said that the plaintiff transferred an immoveable right, and art. 463 of the Civ. Code is relied on to sustain this position. If the expression "*from the object to which they apply*," which occurs both in this and the preceding article, is properly weighed, it will be found that that article relates to successions of which immoveables are a component part.

The words dwelt upon by the plaintiff's counsel, to show that the plaintiff transferred an immoveable, are not found in the corresponding articles of the French Code, or in the Code of 1808. Code Nap. art. 526. Code of 1808, p. 98, art. 22. The compilers of the New Code did not intend to subvert the meaning of well known judicial terms. The heirs or legatees have a real action only when they have the right to claim real property of the estate in kind. Merlin, Questions, *verbo* Légataire, § 8. Merlin, Répert. Légataire, § 6, No. 8. For an analogous case see Civ. Code, art. 1240.

The same description of rights as were originally possessed by the plaintiff, were considered as moveables in the case of *Withers' Heirs* v. *His Executors*, 3 La. 363.

The expression " *universalité de biens*," is applied to such testamentary dispositions only as transfer the whole succession, or the whole residue of a succession to one person, or to several persons *jointly*, without any assignment of parts, or in other words, to forced heirs and to universal legatees. 1 Grenier, 287. 5

Toullier, 485. Civ. Code, art. 1599. It is never used in reference to legatees by universal title, such as the plaintiff, for their shares in the estate are assigned by the testament; and accretion, the distinguishing mark between universal legatees and legatees by universal title, could not have taken place between them. Civ. Code, art. 1700. 1 Proudhon, No. 702. 1 Grenier, 350. 2 Delvincourt, 341.

Even if the plaintiff had no right to dispose of this interest, it would vitiate the transaction only in relation to the house; it would remain valid as to all the other property. *Utile per inutile non vitiatur.* Civ. Code, art. 2410. Code Nap. art. 1449. 2 Duranton, 449. 14 Duranton, 563. 1 Favard, 254. 19 Dalloz, 502. Jurisprudence du XIX Siècle, année 1827, vol. 2, 296. Ib. année 1833, vol. 2, 371.

SIMON, J. This case, which, by a decision reported in 13 La. 177, was remanded for a new trial, for the purpose of enabling both parties to make proof of the various authorizations under which they claim, comes back to us in such a shape as to permit us to give a final opinion on their respective rights, and on the different points of law presented by the pleadings. We shall, however, proceed to consider them on the merits, without any reference to the former decision of this court, which, being apparently predicated on the assumption that the laws of France had been regularly proven, seems to have had for its sole object the solution of the question, whether the plaintiff's capacity to sue was to be regulated by the *lex fori*, or was to be governed by the laws of her domicil?

In conformity with that decision, the plaintiff obtained the authority of a French tribunal to enable her to stand in judgment, and on the production of the evidence of that authority, the defendant renewed his objection, on the ground that it ought to have been obtained before the institution of the suit. This point is made the subject of a bill of exceptions taken to the opinion of the inferior court, permitting the introduction of the said evidence. We think the judge *a quo* did not err. It is perfectly clear that the authorization obtained by the plaintiff, if at all necessary, must now produce the same effect as if it had existed previous to her instituting this action. Arts. 320 and 321 of the Code of Prac-

tice provide, that when a suit is brought by a married woman, without the authorization of her husband or of the court, the defendant shall not be required to answer to the merits, until the plaintiff is assisted in such a manner as to enable her to proceed regularly. This shows that the exception, if insisted on, cannot have any other effect than to require the plaintiff to exhibit her authorization before proceeding any farther in the case ; and it matters not at what time such authority is obtained and produced, provided she be capable of standing in judgment at any time before the trial of the case on its merits.    4 La. 259.

The record, however, does not contain any evidence of the laws of France on that subject, and consequently as the plaintiff was separated in bed and board from her husband in the year 1833, and as this suit was instituted in April, 1838, she was fully competent, under our laws, of acting without the authorization of her husband.    Civ. Code, arts. 125, 2410.   Act of 1826, § 2.    1 Moreau's Digest, 227 ; and no other proof was requisite than that of the existence of the judgment of separation.

On the merits, it is perhaps proper to remark again that the laws of France, relied on by the plaintiff, are not in evidence, and that, therefore, under the well known rule which requires that foreign laws should be proved as facts, we cannot assume any knowledge of them ; and that in the absence of proof of what those laws are, this case must be governed by our own.    1 La. 255,   2 La. 154.   12 La. 465, 589.   We shall, therefore, proceed to consider the matter in controversy, as governed exclusively by the laws of Louisiana, under which, the legality and validity of the act of compromise which is sought to be annulled, and its effect or consequences, ought, in our opinion, to be tested.

The defendant's counsel, in order to resist the plaintiff's action, contends : *First*, that the plaintiff, who was separated in property from her husband, was fully capable, without his authorization, or that of a court of justice, to obligate herself by the act of compromise complained of, inasmuch as it embraced only her moveable property.

*Secondly*, That the powers of attorney under which her agent contracted in her name, were sufficient to bind the plaintiff ; but even if originally insufficient, that the plaintiff cannot now attack

the act in question, because such insufficiency has been cured subsequently by a voluntary execution on her part, equal to an express confirmation or ratification.

I. The solution of this question necessarily requires a preliminary inquiry into the nature of the rights of the plaintiff, to the succession of her uncle. The evidence shows that Julien Poydras died in the year 1834, and that he left an olographic will, in which, after making divers special legacies in property and money, he bequeathed the balance of his estate to his nephews and nieces, by equal portions, in the following words : " *Tous les legs susdits que je viens d'établir préalablement payés et acquittés, je lègue à mes neveux et nièces existans et venus des mariages de mes trois frères et de ma sœur susdits et décédés, la généralité des biens de toute nature que je délaisserai au jour de mon décès en quelque lieu qu'ils soient trouvés ou situés, les établissant mes légataires universels par portion égale entre mes dits neveux et nièces, desquels biens ils ne pourront réclamer la jouissance et la remise que cinq ans après mon décès, par la raison que je les laisse pendant tout cet intervalle de tems entre les mains de mes exécuteurs testamentaires, et au profit de ma succession, pour les recevoir, les réalizer, &c.*" In the beginning of his will, the testator had first proceeded to order the sale of all his property, and to give his instructions to his executors, accordingly, as follows : " *Je vais établir mes volontés pour la vente de ces mêmes habitations, les esclaves en dépendant, et de toutes autres terres cultivées on non, que m' appartiendront et que pourront m'appartenir dans l'avenir et dont ma succession se composera, à la diligence de mes éxécuteurs testamentaires ci-après dénommés trois mois aprés la cloture de l'inventaire de mes biens, après avis, &c., mes six habitations que je viens de désigner, tous les esclaves en dépendant et toutes autres terres m'appartenant, cultivées ou en friche, seront vendues pour le prix en être payé en quatre termes égaux, &c.*" He then goes on providing for the sale of the slaves with the plantations, for their emancipation after a certain period, and imposing other conditions on the purchasers of the plantations and slaves, &c. It seems to us evident, from the above clauses and depositions, that the universal legatees had no right to take possession of any of the immoveable property of the succession, since the

Bonneau v. Poydras.

same, according to the orders and instructions of the testator, was all to be sold and realized, *pour les réalizer;* and that their rights under the will, which they could not set up and enforce before the expiration of five years, were to be limited to their portions of the proceeds of the sale, after satisfaction of all the previous particular legacies. The intention of the testator, from the whole context of the will, all the clauses whereof are to be construed together, is sufficiently clear and explicit. His views were, that all his real property and slaves should be disposed of by his executors for certain purposes mentioned in the will, and those purposes would undoubtedly have been inconsistent with the power allowed to the residuary legatees to take possession of the immoveable property, if their right had not been limited and restricted to their claiming the balance of the estate *after five years;* that is to say, after all the property had been converted into money or notes. Surely, it was not in the power of the legatees to defeat the manifest object of the testator. Their rights under the will could not be exercised but in the state in which they had been put by the testator himself; and it is obvious that he never intended that they should be permitted to take any of the property in kind, and thereby prevent the full execution of his wishes and positive instructions. With this view of the testator's intentions, we cannot hesitate to say, that the rights of the plaintiff to the succession of Julien Poydras, were purely moveable, as they only consisted in her portion of the proceeds of the sales of the property, either in money or in notes proceeding from the adjudications, and ought even to be considered so, although those notes should be secured by mortgages reserved on the property sold. Civ. Code, arts. 466, 467; Merlin, Répert. *verbo* Biens, § 1, No. 13. Voët, Comm. ad Pand. lib. 1, tit. 8, No. 27.

It is urged, however, that, under art. 463 of the Civil Code, which makes an action *for the recovery of an entire succession,* immoveable, the hereditary rights of the plaintiff, though composed of moveables, are immoveable from the object to which they apply. This law, which partly corresponds to art. 22, p. 98 of the Civil Code of 1808, but which did not exist at the time of the opening of the succession, seems to us to relate only to the action which is given by law to the heir, to claim *an entire succession in kind,*

and such as it was at the time of its opening, but does not apply to the case of a residuary legatee, who can only claim his portion of the balance of the estate. According to arts. 867, 868, 869, 870 of the Civil Code, a succession is defined to be *the transmission of the rights and obligations of the deceased to the heirs,* and signifies, also, *that right by which the heir can take possession of the estate of the deceased, such as it may be.* These definitions indicate sufficiently what the law means by the terms, " action for the recovery of an entire succession," made use of in art. 463 ; and from an analogous case, in art. 1240, it appears to us clear, that when the right of an universal legatee, or of a legatee under an universal title, is limited to claiming the moveable part of a succession, or a portion of the residue·thereof, and does not entitle him to take possession of the estate in kind, *such as it may be,* at the time the succession is opened, the law does not allow him the action alluded to in art. 462, relied on by the plaintiff's counsel.

But it is also contended that, among the property embraced in the *transaction,* the plaintiff has an interest in a plantation situated at *Terre aux Bœufs,* and in a house in New York, subject to a life estate. This, in our opinion, cannot make any change in the nature of the right of the plaintiff, such as they originally were under the will, and does not affect the validity of the act complained of. The plantation at *Terre aux Bœufs* did not belong to the succession at the time of its opening. It was subsequently taken in payment by the executors from Jourdan, *frères,* with the consent of the heirs, in consequence of a compromise with the purchasers ; and was afterwards, on the 6th of April, 1829, by a decree of this court, allotted to the other ten heirs of the deceased, in payment of the sum of one hundred and thirty thousand dollars, on account of their rights against the succession. The plaintiff and her sister 'had, therefore, ceased to have any interest in the plantation, at the time the act in question was executed. With regard to the house in New York, it is a well established rule that the capacity to dispose of real property is to be determined by the *lex rei sitœ,* Story, Conflict of Laws, p. 363 ; and in New York, where it is shown that the common law prevails, a married woman may dispose of her separate estate, as if she were

a *feme sole*.   5 Wheeler's Abridgment, 563.   17 Johnson's Rep. 548.

In the present case, the act of compromise attacked by the plaintiff, is nothing but a sale or transfer of her (moveable) rights to the succession of her uncle, for a certain consideration therein stipulated; and was made with a view, not particularly of preventing or putting an end to a law suit which might have existed between her and the defendant, but of avoiding further litigation with her co-legatees in relation to the settlement of the estate; and the question presents itself, could she make such a sale? According to art. 2410 of the Civ. Code, which is the same as art. 97, p. 342 of the Code of 1808, and art. 1449 of the Nap. Code, " The wife separated in property, *may dispose of her moveable property* and *alienate the same* without the consent of her husband.   Toullier, vol. 2, p. 20, No. 632.   Idem, 13, No. 108. Idem, 14, No. 253.  Duranton, vol. 2, No. 490.  Idem, vol. 14, Nos. 424, 425 and 426.   Paillet, No. 2 on art. 1449.   It is thus clear that, being separated in property from her husband, the plaintiff was fully capable of disposing of her hereditary rights, purely moveable, and of alienating or selling them for a valuable consideration; and on this score, the act complained of is legally binding upon her, unless it is shown that her agent acted without authority.

II. The power of attorney, dated 18th Sept. 1824, appears to have been given with a view, among other powers, of authorizing Pelagie Marguerite Mourain, " *de procéder à tous comptes, liquidation, et partage de ladite succession, &c. &c., et généralement faire tout ce que la mandataire verra bien être dans l'intérêt de la comparante, quoique non expressément prévu aux présentes toutes les fois que ce qu'elle fera, tendra à la liquidation, partage, &c.*"   By the second power of attorney, dated 27th Sept. 1827, the plaintiff approves the purchase of the plantation, authorizes her sister to sue in all cases, to pay all accounts, &c. &c.; but neither of those two powers contains any special authorization to execute a sale of her rights to the succession of the deceased, or to make any compromise with respect to her right thereto.   It is true P. M. Mourain had ample power to proceed to the settlement and partition of the estate, to bring suits for that purpose, and that

a suit for a partition was pending at the time the compromise was entered into ; but we cannot consider the act in question as a partition made between co-heirs under any of the powers of attorney ; nor can we say that those powers are sufficient to authorize P. M. Mourain to bind the plaintiff by the act complained of. Such powers ought to have been *express* and *special.* Civ. Code, art. 2966.

But the defendant's counsel insists that the plaintiff has ratified the act by voluntarily executing it ; and that, although no act of confirmation or ratification has been produced, her voluntary execution of it must have the same effect. According to art. 2252 of the Civ. Code, " in default of an act of confirmation or ratification, it is sufficient that the obligation be voluntarily executed, subsequently to the period at which the obligation could have been validly confirmed or ratified ;" and it now behooves us to examine from what facts and circumstances we may fairly and properly come to the conclusion that the plaintiff, by her voluntary execution of the act, has precluded herself from attacking its validity. The evidence shows, that on the 18th of March, 1825, P. M. Mourain bought for her and plaintiff's joint account, a plantation with 143 slaves, for $128,000, for which she gave four notes, payable at one, two, three, and four years from the day of the sale, secured by a special mortgage, and also affected her own and her sister's shares in the succession, the better to secure the payment of the notes. This purchase was subsequently ratified by the plaintiff by her power of attorney of the 27th of Sept. 1827, for which purpose she was duly authorized by a competent tribunal in France. Some time after the purchase of this plantation and slaves, the settlement of the estate was prosecuted ; and owing to certain disagreements and controversies which arose between the heirs and the executors, two different suits were successively instituted for the purpose of ascertaining the portion coming respectively to each of the universal legatees, of establishing the balance due by the plaintiff and her sister on their purchase, and of compelling them to bring such balance, as they should be found to owe, into the mass of the estate. Before the final determination of the last suit, P. M. Mourain, fearing that there would be a large amount to be reimbursed by herself and her sister, conceived

that it would be advantageous to both to bring their portions in the estate to a final settlement; and, according to the wishes expressed by the plaintiff in several of her letters, and acting under the second power of attorney, she proceeded for herself and the plaintiff to make the compromise complained of, by a notarial act, executed on the 24th of July, 1829, and thereby transferred and sold to the defendant all their rights to the estate of Julien Poydras, in consideration of his undertaking to procure them a release for the payment of the price of the plantation and slaves. Several letters written subsequently by the plaintiff show, that she was satisfied with the transaction; and on the 11th of April, 1831, she sent a power of attorney to Delamarre, for the purpose of administering her affairs, and of selling "*par telles voies, à telles personnes, et aux prix, charges, et conditions que le mandataire jugera convenables, une habitation en sucrerie, indivise entre la constituante et Mdme. Mourain, &c.*," revoking the powers by her heretofore given to her sister and to the defendant. Her attorney in fact proceeded to act under this power of attorney, and accordingly sold at auction, by virtue of the same, her undivided half of twenty-two of the slaves purchased by P. M. Mourain in 1825. On the 13th of April, 1833, an action was instituted by the plaintiff against her sister for the partition of the plantation. On the 30th of April, 1834, after her separation from bed and board, her attorney in fact executed an act of partition of the property in kind; and on the 15th of May, 1835, the plaintiff approved a certain account containing several charges connected with and arising out of the act of compromise, such as the amount of the price of a cotton gin, mentioned in the said act. It is true that, on the 1st of Sept. 1835, the defendant agreed, in writing, to produce the vouchers in support of the account, and to account for the sums which should be found incorrect in it; but this, it seems to us, cannot destroy the effect of the written acknowledgment of the plaintiff as to the origin of the articles therein contained. It is also necessary to notice that on the 19th of August, 1829, the mortgage reserved on the sale to P. M. Mourain and the plaintiff, had been raised by the defendant in compliance with the act of compromise; and that the release of the mortgage enabled the plaintiff and her sister to ef-

fect the sale and partition above alluded to, which, without such release, would have been impossible.

From the above facts and circumstances, we feel no hesitation in saying, that the voluntary execution of the act of compromise complained of, on the part of the plaintiff, cannot be doubted ; and it is obvious, that if the defendant had not complied with his obligation as stipulated in the act, the plaintiff would have been unable to dispose of the property by sale or otherwise. Her subsequent acts were a necessary consequence of the compromise ; and cannot be considered in any other light than as evincing a manifest intention to execute it. She availed herself of all the advantages and benefit which she ever had a right to expect from the object of the act. No further claim was set up against her by the succession in consequence of the purchase of the plantation and slaves, and they were for ever released from the mortgage which had been reserved to secure the price thereof. Moreover, when she approved the account of the 15th of May, 1835, she must have been aware that the items included therein resulted from the act of compromise ; and it seems to us that, having, by her own acts, changed the situation of the property, and having done acts of alienation inconsistent with the idea that she was not bound by the act complained of, it would be absolutely impossible to place the parties in the same position in which they were before the execution of the compromise. Duranton, vol. 13, No. 280, says : " *L'exécution partielle démontre, comme l'exécution totale, la volonté de confirmer l'acte vicieux ; c'est une approbation tacite.*" See also Duranton, v. 13, No. 265 ; and Toullier, 8, Nos. 510, 511, 519 and 520, in which he says, " *Si l'exécution volontaire suffit, celui au profit de qui le contrat est ratifié par l'exécution, n'a donc rien autre chose à prouver.*" It is also a well settled principle, that " he who is notified that a contract has been made for him and subject to his ratification, by a person who pretended to have authority for that purpose, must be presumed to ratify it, unless immediately on being informed thereof, he repudiates it." 7 Mart, N. S. 143. 11 La. 288. Pailliet on art. 1985 of the Nap. Code. Now, in this case, about eight years had elapsed between the date of the transaction and the institution of this suit. There is ample proof, from the letters and other subsequent acts

of the plaintiff, that she was immediately notified of its existence. Nay, every thing shows that she was satisfied with it; that she was disposed to, and did voluntarily and effectually execute it; and it is clear to us, that if she ever intended to disavow the act complained of, it was her duty to have done so immediately on being informed of its execution. We have every reason to believe that the present suit is nothing but the result of an afterthought on her part; and if so, she cannot be entitled to any relief at our hands. We must, therefore, conclude that the plaintiff, by her acts and general conduct, has tacitly and sufficiently ratified the act of her mandatary; and that the judge *a quo* erred in not giving to it its full legal force and effect.

An attentive examination of the voluminous record which contains the provisional settlement of the state, and exhibits the real situation of the succession, has convinced us that far from having been injured by the act of compromise sought to be annulled, the plaintiff has, on the contrary, been greatly benefitted thereby; and it is, at least, doubtful whether her portion will ever amount to the one half of the price of the property which she has had the enjoyment of ever since the purchase. We cannot forbear expressing our opinion that the equity of the case is also with the defendant.

It is therefore ordered, that the judgment of the District Court be reversed; that the act of compromise attacked in this suit, be maintained; and that our judgment be for the defendant, with costs in both courts.*

---

*R. N. Ogden* and *A. N. Ogden,* for a re-hearing. The former judgment was conclusive, on the merits, in favor of the plaintiff, who was entitled to a final decision, on the failure of the defendant to produce any other authorizations than those introduced on the first trial, and on showing herself duly authorized to sue.' The decretal part of the judgment must be construed with reference to the body of the decision, from which it appears that the case was remanded only for the purpose of receiving evidence as to the authorization of the plaintiff to bind herself by the compromise, to commence a suit. The decision, just rendered, is based on the mistaken opinion, that the right of the plaintiff to the succession of her uncle was a moveable. The court seem to have derived this opinion from the will. "The rights of the plaintiff," say the court, "were purely movable, as they only consisted in her portion of the proceeds of the sale of the property of the succession." Again: "It seems to us evident, from the above clauses and conditions, that the universal legatees had no right

to take possession of any of the immovable property of the succession." The testa-tor says, " *Je lègue à mes neveux et nièces existants et venus des mariages de mes trois frères et de ma sœur susdits et décédés, la généralité des biens de toute nature que je delaisserai au jour de mon décès, en quelque lieu quils soient trouvés ou situés.*" The following clause is the only restriction on their rights as universal heirs : " *desquels biens ils ne pourront réclamer la jouissance et la remise que einq ans après mon décès,* &c." It is evident from those provisions that if, at the end of five years, no sale had been made by the executors, or if the property so sold had been received back in conse-quence of the non-payment of the price, the property would have belonged to the heirs under the will. The decision rendered in the case of *Poydras* v. *Taylor et al.,* 9 La. 488, 18 La. 12, is inconsistent with the idea, that the legatees under the will of Julien Poydras, were the mere legatees of *movable property.* That was an action. by the present defendant, whose rights as a legatee are the same as the petitioner's, to compel the purchaser of property at the sale of the succession of Julien Poydras to comply with the terms of the sale, and to prevent him from selling from the plan-tations negroes, who were, by its terms, to be considered as attached thereto, and only susceptible of alienation with the plantations themselves. The court then held that Benjamin Poydras' capacity, as an heir, authorized him to maintain the action, and to see that the conditions of the sale were strictly complied with. The rights of the heirs cannot be considered moveable, as the succession itself was composed of immove-ables. Though the whole estate had been converted into money, the right of the plaintiff in the succession would be an immovable, under art. 463 of the Civ. Code.

The compromise was a sale, not only of the plaintiffs hereditary rights in the suc-cession, but of immovables belonging to it, and was void for want of authority. She was not separated from bed and board until 1833, and her acts, prior to that period, from which it has been attempted to deduce a ratification of the compromise, can produce no effect against her. The only act, subsequent to 1833, from which a ratification has been inferred, was the order to her agent for the payment, if he found it correct, of an account composed of many items, one of which was for her portion of the notarial fees which her sister had contracted to pay for the execution of the act of compromise. But this was in 1835, after the plaintiff had already sued for the rescission of the act itself. Can such an order, under such circumstances, be reasonably construed into a ratification of the compromise ? In the cases of *Rivas* v. *Bernard,* 13 La. 159 and *Copeland* v. *Mickie et al.,* 17 Ib. 286, it was held, that to amount to a ratification, the acts must be of a nature to show clearly the intention to ratify ; and that the ratification must be the necessary consequence of the acts.

The court have also erred in deciding that it was necessary that the laws of France should have been proved *as facts.* In the first decision, it recognized the laws of that country as governing the case, and decided it on their knowledge of those laws, as not being foreign laws, they having been in force when this state formed a part of the French empire, and, consequently, not requiring proof. The principle that such laws were not required to be proved as facts, was recognized in the case of *Malphen* v. *McKown et al.,* 1 La. 254.                                              *Rehearing Refused.*