## No. 9162.

HUGH ALLISON & CO., IN LIQUIDATION, VS. MILLIE B. WATSON,

AND

MRS. M. B. TULLIS AND HUSBAND VS. L. M. WATSON ET AL.

Consolidated.

A person who has been emancipated on his own petition by the decree of a competent court having jurisdiction over his person, correct in form, will be estopped from invoking the nullity of said judgment against third persons who have dealt with him as an emancipated minor.

In such cases, persons dealing with emancipated minors are not required to look beyond the decree.

The acts of an agent, even if unauthorized by his mandate, or in violation thereof, are considered as ratified by the principal by acquiescence if, after knowledge of the same, he does not repudiate them.

APPEAL from the Ninth District Court, Parish of Tensas. Hough, J.

---

*Percy Roberts, L. V. Reeves* and *H. R. Steele* for Plaintiffs and Appellees.

*Wade R. Young* for Plaintiffs and Appellants.

---

The opinion of the Court was delivered by

POCHÉ, J. The issues presented in these two cases will be better understood by a statement of the salient facts which have given rise to the litigation.

A. J. Watson died in Tensas parish in 1862, leaving a widow and an only child, then an infant. The latter was his sole heir and inherited several plantations situated in that parish. In 1865 his widow married his brother, A. C. Watson, without being retained in the natural tutorship of her child by a family meeting. Soon after the marriage a family meeting was convened and recommended her as tutrix and her husband as co-tutor of the minor, Millie B. Watson, relieving her from the necessity of a bond of tutorship.

They were both qualified in their respective capacities and the co-tutor assumed control and the full administration of the minor's property, which he continued as tutor until March, 1881 and as agent until July, 1882, when she married and then assumed control of the same.

On a petition presented by her, with the written consent of her tutrix and co-tutor, to the District Court of Tensas, she obtained a full decree of emancipation on the 2d of March, 1881.

A few days thereafter she came to this city, accompanied by her step-father, for the purpose of negotiating a loan with a view to properly supply and equip her plantations, so as to enhance their cultivation and productiveness.

At that time there stood on plaintiffs' books, as commission merchants, an indebtedness exceeding $5000, incurred in the cultivation of her plantations, the account being in the name of "A. C. Watson." The latter then called on plaintiffs, to whom he represented himself as the agent of Miss M. B. Watson, who had just been emancipated, and he obtained from them on that day advances in mules and supplies of sev-

eral hundred dollars, with the understanding that these advances were made to Miss Watson, and that the latter would assume the payment of the account due to them for previous advances of money and supplies for the use of the same plantations, but standing in the name of A. C. Watson.

On the same day, one of the plaintiffs met Watson and Miss Watson by appointment, and in his presence, at the request of her step-father and agent, she signed the following document:

"NEW ORLEANS, March 19, 1881.

"*Messrs. Hugh Allison & Co., New Orleans:*

"GENTS—You will charge account of A. C. Watson to me, and oblige,

"Yours, respectfully,

"MILLIE B. WATSON."

A short time thereafter she obtained a loan of $15,991, to secure which she mortgaged her plantations by act passed on the 7th of April, 1881—and she then gave a power of attorney to A. C. Watson, authorizing him to administer her affairs, with the express authorization to draw against her funds then in the hands of Shattuck & Hoffman, a commercial firm in this city.

On the 6th of May following, Watson, the agent, made a part-payment on the account assumed by Miss Watson of $4000, by a draft on Shattuck & Hoffman, which was credited to the account opened in her name by plaintiffs, Allison & Co.

The account was continued until June, 1881, when it was closed after a few additional advances and after the sale of some twenty-six bales of cotton shipped to plaintiffs from Miss Watson's plantations. The balance of the account was then for $2520 56 in favor of plaintiffs, who brought this suit in June, 1882, to enforce payment of the same.

The defense is a denial of any indebtedness to plaintiffs, resting on the main grounds of her incapacity to enter into any contract in March, 1881, for the reason of the alleged absolute nullity of the judgment of emancipation rendered on her petition on the 2d of March, 1881; and on the further ground that she had signed the assumpsit of March 19, 1881, through error and through misrepresentations of her step-father, A. C. Watson.

The alleged ground of nullity of the judgment of emancipation is, that in 1876, her mother and the co-tutor had forfeited the tutorship by removing their domicile to the State of Mississippi, and that the proceedings for her emancipation had not therefore been carried on contradictorily with a tutor, as the law requires. The answer concluded

with a reconventional demand for the sum of $4000, alleged to have been paid to plaintiffs by her agent without authority.

At the same time defendant brought a suit for the nullity of the judgment of emancipation, to which her mother, her step-father, and Hugh Allison & Co. were made parties. This is the suit which is consolidated with plaintiffs' main or original demand.

Judgment was rendered maintaining the legality of the judgment of emancipation, rejecting the reconventional demand, and rejecting plaintiffs' claim on their balance of account. Both parties have appealed.

The effect of the judgment of emancipation is the pivotal question of the case, and to it we shall first direct our attention. Among other defenses urged by Hugh Allison & Co. to the action in nullity of that judgment is the plea of estoppel, by which Miss Watson, now Mrs. Tullis, is denied the right of setting up the nullity of a judgment provoked by herself and showing no elements of nullity on its face.

The record shows, and it is not contested, that the court which rendered the judgment was a competent tribunal and that it had jurisdiction over the person of the minor applying for emancipation. The alleged forfeiture of the tutorship by the removal of her mother, could not have the effect of changing the minor's domicile.

Although she alleges that she gave a reluctant consent to her step-father's entreaties to apply for her emancipation, she does not deny that she applied for it of her own free will, nor does she allege that the judgment was obtained through fraud, and much less does she connect the plaintiffs, Hugh Allison & Co., either by knowledge, or advice, or request on their part, with the proceedings.

The record shows that she authorized the information conveyed to plaintiffs of her having been emancipated, and that in the presence of one of the firm she exercised her rights as an emancipated minor by signing the document which we have transcribed above. Admitting for the sake of argument that she then thought, as she now pretends, that she was only signing a security for the payment of mules purchased for her on that day, her act was nevertheless, and to her full knowledge, that of a person acting in his own right and relieved of the disabilities which attach to minors.

Will the law now empower her to meet these same plaintiffs with the assertion that she was not then emancipated and that she was therefore deceiving them? The answer is too plain for argument. The rule is well settled that in such cases the parties dealing with the emancipated person are not bound to look beyond the decree of eman-

cipation. "Any other doctrine would make such decrees snares to the public." 10 An. 66, Jeannet vs. Ricker; Dupré vs. Dupré, 28 An. 418. See also, 13 La. 433, Lalanne vs. Moreau; 7 A. 9, Faber vs. Hepp; 26 An. 418, Rhodor vs. Rosselin.

She was born in October of the year 1861, and was married in July, 1882. Hence, in April, 1881, when she executed the $15,000 mortgage, and in which she acted in her own right, she acted on the faith and strength of the decree of emancipation which she now holds up as an absolute nullity.

She is, therefore, effectually estopped from the plea of nullity of the judgment of emancipation.

We shall now deal with the grounds urged in support of her reconventional demand.

Her able counsel has made a strenuous effort in support of the alleged error under which she signed the assumpsit of plaintiffs' account, by trying to connect one of the plaintiffs with the alleged misrepresentation that the document which she signed was merely a security for a mule purchase. He is not in the slightest degree borne out by the record, which shows that the document had already been drawn by Watson when one of the plaintiff firm, W. A. Peale, met him by appointment, and that the request to sign the paper was made to Miss Watson by her step-father, and that Mr. Peale did not even hear the explanation made by Watson touching the nature of the document which she signed then and there. If, therefore, she was deceived as to the purport of the obligation which she contracted, the deception cannot be attributed to plaintiffs, but it must be laid at the door of her own step-father and ostensible protector. It was her right and her duty to read it. It would have taken very little time to read a plain sentence of not more than two lines in writing. Her failure to seek and obtain information which was so easily within her reach is her own fault and must be her misfortune. Mr. Peale, who had called at the time and place to meet her, by appointment with Watson, for the express purpose of receiving that identical document, had every reason to expect and believe that she had been fully informed of the purport of the transaction, and that she acted with full knowledge of the consequences of her actions in the premises.

Such is the presumption of the law. Allen, West & Bush vs. Whestone, 35 An. 846.

But if we could find room for a doubt of the binding effect of the assumpsit, we may turn to her future acts as a test of her understand-

ing of the transaction. If it were true that she had been deceived even with the co-operation of plaintiffs, she would naturally be expected to repudiate the obligation as soon as she was informed of its real purport and intent. But the record shows the very reverse. In her own testimony we find the following statement: "It was after the time that I signed this alleged assumpsit that Mr. A. C. Watson told me that he had taken $4000 of the money I got from Shattuck & Hoffman and paid it to Hugh Allison & Co."

This was a direct information of the existence of an indebtedness to these plaintiffs and that her funds were applied to the same. The payment was made in 1881, and no objection was ever made before the institution of this suit. The record shows that far from repudiating the transaction, Mrs. Tullis, in granting a new mortgage which she executed in November, 1882, after her marriage and while this suit was pending, in order to better secure the Shattuck & Hoffman loan, she included that sum of $4000 in the new notes which she then executed. This is admitted by her counsel.

Thus we find that the ratification of her agent's contracts, even if originally unauthorized, is shown not only by acquiescence and long silence preceded by knowledge, but by acts and deeds which manifest unmistakable indications of an active ratification of the acts which she now seeks to evade.

In two recent cases we have had occasion to examine the doctrine of ratification of contracts executed by agents, as settled in our jurisprudence, and we unqualifiedly reaffirmed the rule which is quoted above. Lafitte, Dufilho & Co. vs. L. Godchaux, 36 An. (not yet reported); Bennett vs. Mechanics and Traders' Bank, 34 An. 150; see also, Woods et al. us. Roschi, 32 An. 210; James vs. Louis, 26 An. 664; Ball vs. Bender. 22 An. 496; Oliver vs. Johnson, 24 A. 460; Bonneau vs. Poydras, 2 Rob. 1; Starr vs. Zacharie, 18 La. 517; Dupré vs. Splane, 16 La. 51; Pitts vs. Shubert, 11 La. 288.

We note the argument made by counsel, based on the prohibition contained in Art. 361, C. C., against all agreements between the tutor and the minor, unless the same was entered into after the rendering of a full account and delivery of vouchers, etc. As the contract herein attacked by the defendant was with and for the interest of third parties, and to which the tutrix and the co-tutor were not even parties, we fail to see any force in the argument.

The foregoing reasons apply with equal force to the liability of the defendant on the unpaid balance of plaintiffs' account which she as-

sumed on the 19th of March, 1881. After the date of her assumpsit, further advances were made for the use of her plantations and payments were made by consignments of cotton which had been produced on her places. The business was managed by Watson, who held her power of attorney, and no effort has been made to show any disapproval or repudiation of his acts by his principal.

The theory of the case, which finds ample support in the record, is the following:

From the time of his marriage, Watson cultivated Mrs. Tullis' plantations as his own and for his own account, up to the year 1880. At that time, as his credit was on the wane, he disclosed his true relation with the property to plaintiffs (his merchants), and he then informed them that the plantations were the property of the minor and that, therefore, "they could not lose." The result of that year's operations was a balance against him of $5836 79.

Distrust on the part of plaintiffs was the first consequence of the disaster. Hence flowed the necessity of furnishing security for the purpose of future advances, and then the proceedings for the emancipation became necessary and she was emancipated. They met with vexatious delays in negotiating the heavy loan—and the wants of the plantations were becoming pressing, labor became disorganized, and advances were needed immediately. The arrangement with plaintiffs secured the most urgent wants, and by supplying these they secured their past account, which Miss Watson assumed with full knowledge that the past advances for the year 1880, and the present supplies, included working animals, farming tools, etc., all of which had been advanced on her credit and for her benefit. Hence the inevitable conclusion that as she intended to bind herself, so must she be held as bound.

The judgment of the lower court is, therefore, reversed in so far as it rejects plaintiffs' demand, for which judgment is rendered in their favor in the sum of $2520 56, with legal interest from June 30, 1881; and that said judgment be affirmed in all other respects, defendant to pay costs in both courts.

Rehearing refused.

---

## ON APPLICATION FOR REHEARING.

FENNER, J. The facts affecting the only question requiring reconsideration are few and simple. The evidence is brief and not even conflicting.

Watson, who had been co-tutor of his niece and step-daughter, had been managing her plantations during her minority, without any judi-

cial authority, through Allison & Co. as his factors, and had accumulated a debt of $5836 on an account kept in his own name, for which it is not even pretended Miss Watson was liable, and of even the existence of which it is not shown she knew.

After her emancipation in 1881, she and Watson came to New Orleans to negotiate a loan for $15,000, by mortgage on her plantations, from Shattuck & Hoffman.

Encountering delays in consummating the loan and being in evident need of some mules and supplies, Watson, alone, called on Allison & Co., and after other rejected propositions finally agreed with them that, if they would furnish certain mules and supplies, to be shipped that evening, Miss Watson would pay the amounts by shipments of cotton and out of proceeds of the Shattuck & Hoffman loan when completed; and would, in addition, give a letter authorizing Allison & Co. to charge to her account the amount due on the account of Watson.

The mules and supplies, amounting, with $100 cash advanced, to $868 10, were accordingly shipped the same day on the very boat on which Watson and Miss Watson were returning home. That evening, Peale, one of the partners of Allison & Co. went to the boat to get the promised letter, met Watson, who showed him the unsigned document, in these words: "Messrs. Allison & Co.—Gents: You will charge account of A. C. Watson to me, and oblige yours respectfully." They went back together to get Miss Watson's signature.

Watson told her, in Peale's presence, he had something he wanted her to sign. She inquired what it was he wanted her to sign. Thus far the three witnesses agree. Peale heard her ask the question, and says: "I remarked to her it showed business precaution on her part to learn what she was signing before doing so."

Now, Miss Watson says Watson assured her "it was only for payment of some mules he was taking up on the boat."

Watson states the same thing.

The testimony of Peale is singularly reticent on this point. He does not deny that any answer was made. He does not say that he didn't hear the answer. He does not say what answer was made. He simply ignores the subject after stating Miss W.'s question and his remark upon it.

This is absolutely all there is in the record on this subject, and it certainly establishes that the assumpsit of Watson's large debt of $5836 was made by the young lady through error and misrepresentation.

There is not a word of evidence to show that Miss Watson ever knew that Watson owed such debt to Allison & Co., or any debt, unless for the mules and supplies shipped that day—and which she positively swears was the account which she supposed and was told she was assuming by the letter.

Under this letter so given, Allison & Co. passed Watson's account to debit of Miss W. Some few further advances were made. Cotton was shipped to them and credited to her. Watson, having authority from Miss W. to draw drafts on Shattuck & Hoffman, after the loan from them was consummated, gave Allison & Co. a sight draft for $4000, which they received and credited—the final result being that the entire indebtedness remaining due them has been reduced to $2520, and instead of having suffered by acting on the letter of Miss W., given through error and fraud, they have been benefited to the extent of several thousand dollars.

Principles of estoppel, therefore, have no application; at least so far as their claim for the balance remaining due is concerned.

As to the alleged ratification of the transaction by subsequent conduct, the sole act relied on is the payment of the $4000 by a sight draft on Shattuck & Hoffman, as to which the only evidence affecting her is her own statement that some time after this transaction, "Mr. A. C. Watson told me he had taken $4000 of the money I got from Shattuck & Hoffman and paid it to Hugh Allison & Co."

There is not another solitary word of evidence in the record that I can find connecting Miss Watson with this payment, except that it was included in the compromise with Shattuck & Hoffman, which is not significant, because Watson's authority to draw on them was general and undisputed, and of course she was bound by his draft, for whatever purposes.

As a ratification, these acts are entirely wanting in the essential element of proof that they were done with the knowledge of the facts, of the error and deception which had been practiced, and with the intent to ratify.

She had never received any accounts of any kind from Allison & Co. She had had nothing to do with the management of her business, which had remained in the hands of Watson. She was as ignorant as a child about these transactions. She may have supposed that as much as $4000 was due on her own business. She may have inferred that Watson had used her money for his own benefit and might not have objected thereto. But there is nothing to show that, with knowledge of the deception and of the large debt with which she had been charged, she ever consented or intended to ratify that charge and to make herself liable, not only to the extent of the $4000 paid, but for the large balance now claimed against her.

I, therefore, think that justice has not been done and that a rehearing should be granted.

Todd, J., concurs in this opinion.