Raymond et al. Commissioners, etc. vs. Palmer et als.

No. 10,218.

W. C. RAYMOND ET AL, COMMISSIONERS, ETC., VS. E. C. PALMER ET ALS.

In law the component parts of a firm are distinct beings from the firm, as well as from each other, and their rights and liabilities must be tested and adjudicated accordingly.

Hence a bank can claim no lien or privilege on the deposit of a partner made on his separate account, in order to set off the same against a debt owing them by the firm.

The silence of a principal after knowledge of an unauthorized or illegal act of his agent, is equivalent in law to an acquiescence in, and ratification of, the act or conduct of the agent.

APPEAL from the Civil District Court for the Parish of Orleans. *Houston*, J.

*W. S. Benedict* and *Rouse & Grant* for Plaintiffs and Appellants.

*Henry C. Miller*, for Defendant and Appellee:

The right of the depositor or customer to check upon the amount properly to his credit in the bank, is not in the least affected, nor is the corresponding obligation of the bank to pay the check in any degree modified by the fact, if it be the fact, that the customer's commercial firm account is overdrawn, for the individual and the firm account are separate, disconnected and distinct. See Morse on Banks and Banking, page 48, Chapter on depositors and customers.

Nor is the depositor's right to draw or the obligation of the bank to pay such check, modified or affected in any manner by the fact, if it be a fact, that there is an indebtedness of the depositor to the bank, arising from the alleged use or conversion by the depositor of property claimed to belong to the bank, or arising from other transactions between the bank and the depositor, for no bank can refuse to pay the check of its depositor or customer drawn upon his credit, because of any indebtedness, real or supposed, the bank may claim to be due to it by the depositor. See Civil Code, Article 2956; Breed vs. Purvis, 7th

Ann., page 53; Morgan vs. Lathrop, 12th Ann., page 257; Murdock vs. Citizen's Bank, 23d Ann., page 113; Gordon vs. Muchler, 34th Ann., page 604.

The pledgee cannot acquire the pledge by a private sale, and all the benefit he can ever derive from any such sale is the application of the proceeds of the sale fairly made, to pay the pledged debt. Jones on Pledges, Section 635; Story on Agency, Section 207; Richardson vs. Mann, 30th Ann., page 1060; Adams & Co. vs. Coons et al, 37th Ann., page 305. Hence, if the Louisiana Savings Bank, pledgee of the stock in controversy in this case, by the resolution of its Board of Directors directed the private sale of the stock, and if the bank received and applied to the pledged debt the full proceeds of such sale fairly made, for the full market value of the stock, then, the bank, deriving all the benefit it could obtain from the pledge and sale thereof, and sustaining no injury in the premises, can make no complaint whatever of the sale, and sue for the stock, as it does in this case, on the ground that the purchaser at the private sale was Palmer individually, he being at the time the president of the bank.

Least of all, can the bank complain of the sale, holding on, as it does, to the proceeds of the sale applied to pay the pledged debt.

The owner of the pledged property may, under certain circumstance, complain of the private sale of his property, as in the case where the pledgee buys and makes a speculation by an advance in price, or where the sale is unfair or for an inadequate price. but even the owner is estopped from demanding the stock, unless, seasonably, he makes the demand and tenders the amount of the debt. Besides, the owner in this case makes no claim. Lacomb vs. Forstall, 123 U. S., 570.

———

*Bayne, Denegre & Bayne,* and *Farrar, Jonas & Kruttschnitt,* for Moore, Hyams & Co., Defendants and Appellees:

I.

### PALMERS'S CASE.

1. Palmer, individually, was a creditor, not a debtor, of the bank when the stock was purchased by him. The solvency of his account is fully shown.

2. Even where a bank lends, on pledge of securities or otherwise, to an overdrawn depositor, it is bound to pay such depositor's checks to the amount of the loan, and cannot be permitted to compensate the debt on the loan with the depositor's overdraft, and that a deposit cannot be extinguished by compensation with a debt of a different character, is too clear for argument. C. C. Art. 2210; Nolan vs. Shaw, 6 Ann. 46; Morgan vs. Lathrop, 12 Ann. 257; Breed vs. Purvis, 7 Ann. 53; Hancock vs. Citizens' Bank, 32 Ann. 590.

3. Palmer's purchase of the stock from the bank was regular, at fullest market prices, through the cashier, was duly reported to the board, and never repudiated by it.

4. A condition precedent to such repudiation would be the return by the board of the amount received by the bank from the repudiated transaction.

5. Mathers, the pledgeor and real owner of the stock, has never repudiated the purchase by Palmer; but, on the contrary, has ratified and affirmed it.

6. An invalid contract by an agent will be held as ratified by the principal after a tacit acquiescence and long silence, and this rule applies to a sale of stock by a pledgee to himself. Lafitte vs. Godchaux, 35 Ann. 1161.

7. Even if Palmer has no title, the commissioners cannot recover, because they represent the pledgee alone, and not the pledgeor. The latter must assert his own rights; the commissioners represent the creditors of the bank *ut universi* and not *ut singuli.* Hence, even if we admit that Mathers is a creditor of the bank, they do not represent him. Raymond vs. Palmer, 32 Ann. 277.

Raymond et al. Commissioners, etc. vs. Palmer et als.

8. One claiming property as owner cannot recover as pledgeor. The *allegata* and the *probata* must agree. Nugent vs. Buisson, 35 Ann. 108.

## II.

### MOORE, HYAMS & CO.'S CASE.

1. The commercial law, as settled in other States of the Union, is uniformly followed by the courts of this State, which even disregard the Civil Code where inconsistent with the general commercial jurisprudence. Wagner vs. Kenner, 2 R. 124; Thompson vs. Mylne, 4 Ann. 210; Dubuch vs. Godchaux, 6 Ann. 781; Story vs. Hope Insurance Company, 37 Ann. 257.

2. The provisions of Article 2453 C. C., do not apply to stocks, bonds, notes or other commercial property or evidences of debt.

3. The doctrine of the nullity of a sale as to a purchaser *pendente lite* does not apply under the general commercial law to shares of stock in a corporation. Lowell on Transfer of Stock, No. 67; Dovey's Appeal, 97 Pa. Stat. 153; Leitch vs. Wells, 48 N. Y. 585, and especially 615; County of Warren vs. Marcy, 97 U. S. 96; Orleans vs. Platt, 99 U. S. 683; Holbrook vs. N. J. Zinc Co., 57 N. Y. 616 and 617.

It is universally held not to apply to negotiable securities, and this court has repeatedly placed stocks in the same category. Factors' and Traders' Ins. Co. Case, 31 Ann. 149, and especially 151; Pitot vs. Johnson, 33 Ann. 1287; R. C. C. 3158.

4. The prayer of the petition being in the alternative, the judgment against Palmer (if any) must necessarily be in the alternative for the stock or its value; and plaintiffs have, by their pleadings, failed to keep the stock in *gremio legis*. They have, on the contrary, expressly assented to its removal from the custody of the court, and to a judgment for its value *in lieu* of the stock itself.]

5. The negligence of plaintiffs in failing to make the Lottery Company a party to this suit until many years after its inception, and after the stock had been sold for years, facilitated the acquisition of the stock by defendants as *bona fide* purchasers; and now estops plaintiff from claiming the stock. A party who stands by and allows another to deal with property as his own cannot dispute the right of one whom he has assisted in deceiving. 2 Story Eq. No. 1537; 2 Phillips Ch. R. 123; 10 A. & E. 90; 5 Johns. Ch. 272; Orleans vs. Platt, 99 U. S. 682.

6. The Lottery Company was a necessary party to a petitory action for the stock, and in its absence no *lis* was pending as to the stock, of which any one, even on plaintiff's own theory, was bound to take notice. Kendig vs. Dean. 97 U. S. 423.

7. Moore, Hyams & Co. are not shown to hold any of the original 177 shares of stock; they prove conclusively that they actually transferred to other parties all but 59 shares, and these were so commingled with other stock that it is impossible to tell what became of them. As to all but 59 shares they are clearly not responsible; as to these 59 shares they are not responsible. because of the laches of plaintiffs, who must suffer, if any one.

8. If the plaintiffs recover of Moore, Hyams & Co., then the latter are entitled to judgment against the Louisiana Lottery Company. Moore, Hyams & Co. purchased in the usual customary way and parted with their money solely on the faith of a certificate in their name issued by the Lottery Company, and only after the issue of the certificate. A certificate of stock in a corporation, under the corporate seal and signed by the officers authorized to issue certificates, estops the corporation to deny its validity as against one who takes it for value, and with no knowledge or notice of any fact tending to show that it has been irregularly issued. The purchasers of stock are not bound to look beyond the certificate, or to examine the books of a corporation to ascertain the validity of the transfer. Lowry vs. The Farmers' Bank, Taney's Decisions, 310; Honold vs. Meyer, 36 Ann. 585; Davis vs. Bank of England, 2 Bing 33; Morawitz on Private Corporations, sec. 210.

9. The action of plaintiffs is barred by the prescription of three years under C. C. Art. 3506.

*Thos. J. Semmes* and *Joseph P. Hornor* for the Louisiana State Lottery Company, Defendant and Appllee.

---

The opinion of the Court was delivered by

Poché, J.   Plaintiffs brought this suit as commissioners of the "Louisiana Savings Bank and Safe Deposit Company" in liquidation, to recover 177 shares of Louisiana Lottery stock, alleged to have been the lawful property of said corporation, on the 27th of May, 1879, when said stock was illegally pledged, as his property, to the People's Bank, by E. C. Palmer, then the president of the Louisiana Savings Bank. At the instance of the commissioners the pledged stock was sequestered.

On motion of Palmer, the sequestration was bonded on the 18th of February, 1880, on a bond of $8585, which was then the market value of the stock after deducting $10,000, the amount for which it had been pledged by Palmer, the stock being then worth $18,585.

On the 24th of February, 1880, the stock, which stood in the name of Palmer on the books of the Lottery Company, was sold by him, through a broker, to Moore, Hyams & Co., for the sum of $22,125, at the rate of $125 a share of a par value of $100.

In his answer, Palmer claimed that he was the true owner of the stock at the time that it was pledged by him to the People's Bank.

He avers that the stock had been originally pledged to the Savings Bank by one John Mathers, Jr., to secure the latter's indebtedness to the bank, accompanied by the customary form of transfer in blank, followed by a subsequent transfer to Palmer, to be held by him, for the benefit of the bank, as pledgee.  He then avers that by resolution of the Board of Directors, under date of March 31, 1879, he was authorized and directed to sell said stock at its market value, and that after repeated and vain efforts to obtain a better price, he took up the stock for himself at $50 a share, making the total price of $8850, and which was the highest obtainable, which amount was paid by him to the bank, all to the full knowledge of the directors, which sum tuhs paid by him was credited to the account of John Mathers, Jr., the pledgeor.

The suit was instituted on the 18th of November, 1879.  Palmer's answer was filed on the 3d of December following, from which time no steps were taken and no further proceedings were had in the litigation until the 4th of February, 1887, when plaintiffs filed an amended petition, making the Lottery Company a party, praying for dividends in the

sum of $250,000, and reiterating their original demand against Palmer and against the People's Bank.

On the 19th of March, 1888, plaintiffs filed a second amended petition for the purpose of bringing into court the firm of Moore, Hyams & Co., the purchasers of the stock from Palmer; judgment was asked against them for the restitution of the 177 shares of stock, and in default of the delivery of the same, for judgment against the firm at the rate of $1000 a share, alleged as the then market value of the stock, as well as for dividends received by them thereon.

The defense of that firm was a general denial, coupled with the aver ment of their good faith in the purchase of the stock, which they acquired in open market from persons in the habit of selling such things, before paying which they saw that the same had been duly transferred to them on the books of the company. The answer ended with a call of the Lottery Company in warranty.

As the record shows that the People's Bank has been reimbursed the amount of its loan to Palmer, that corporation is thus stripped of all interest in the controversy, and is, thereof, practically out of the case.

Judgment was rendered in favor of plaintiffs against the defendant Palmer in the sum of $18,530, as the value of the stock on February 18, 1880, with legal interest from that date, with lien and privilege on the property sequestered, so far as represented by the forthcoming bond given to release the sequestration, and in all other respects the judgment went in favor of all the other defendants.

Palmer has appealed from the judgment against himself, and plaintiffs appeal from the entire judgment.

Considering the restricted issue presented by the pleadings, an immense mass of testimony and of documentary evidence comes up to swell the voluminous record in this case, in which an unprecedented latitude was allowed to plaintiffs' counsel in a tedious investigation of complicated matters, accounts and even of gossip which had not the remotest bearing on the true issues of the controversy, and which our duty compelled us to examine in our search for the truth. After a patient and painful labor to separate the chaff from the grain, we find the following as the salient, uncontested facts bearing on the issues presented for decision :

The 177 shares of stock in suit were the lawful property of John Mathers, Jr., who pledged them to the Louisiana Savings Bank and Safe Deposit Company to secure two loans aggregating together the sum of $12,000, represented by two notes payable on demand, and long past due on the 31st of March, 1879, the day on which the Board of

Directors, by resolution, instructed their president (who was E. C. Palmer, the principal defendant herein) "to realize on that stock" and on other values enumerated in the resolution. The pledge included the authority to the pledgee to sell the stock at public or private sale and without recourse to legal proceedings for said purpose.

At that time the stock of that company was as low down as it had ever reached since the company had been put into operation.

By an Act of the Legislature, passed during the session of 1879, and approved on the 27th of March of that year, the charter of the Lottery Company had been repealed, and great consternation prevailed among all the holders of its stock, to such an extent that for a few days there was no market at all for such stock.

At that juncture the Savings Bank was in great financial distress, soon culminating in disastrous insolvency, which led to the closing of its doors on the 30th of June of that year.

It is thus apparent that the Board of Directors were impelled by two combined and imperious reasons to dispose of that stock. Towards the end of May, owing to well known causes, useless to enumerate here, the stock of the company had somewhat recuperated, and was quoted on the market at $49 to $50 per share.

The stock involved in this case was repeatedly thrown on the market, without an offer up to $50 a share, from the 31st of March up to the 27th of May, 1879, when Palmer, the defendant, concluded to take it for himself at that, which was the highest market price.

On the same day he pledged it to the People's Bank to recover his note of $10,000; and on the same day he deposited to his credit in the Savings Bank, the amount which he had realized on his note, to-wit: $9573 75. On the 29th of May he drew his check for $3850 to the order of the cashier of his bank, in payment of the stock in question, and on that day that amount was credited on the books of the bank, to the account of John Mathers, Jr., with a corresponding debit to the deposit of E. C. Palmer, which on that day showed a balance of $25,406 25 in his favor as a depositor.

Owing, doubtless, to the enactment by the Constitutional Convention of an ordinance known as Article 167 of the Constitution, and of the adoption, on the 2d of December, 1879, of that Constitution by the people, the value of lottery stock began to appreciate very rapidly, and by the 18th of February, 1880, when Palmer bonded plaintiffs' sequestration, it was quoted on the market at $105 a share, on which basis the amount of the forthcoming bond was predicated. By the 24th of that month that stock was quoted at $125 a share, and it was on that

day and at that price that it was sold by Palmer's broker to Moore, Hyams & Co.

And by the time that the judgment in this case was rendered, in July, 1888, that stock had reached the phenomenal value of $1000 a share.

It also appears that John Mathers, Jr., the original owner of the stock and the pledgeor thereof, had full knowledge of the transactions hereinabove recited, and that he made no objection. In April, 1881, Mathers made a voluntary surrender of his property under the insolvent laws of this State, and in his schedule of assets he entirely failed to include, or make any reference to the stock in question, and in the statement of his liabilities he acted upon the condition of his account with the bank as affected by the credit of $8850 arising out of the sale of the stock which he had pledged to that corporation.

It is hardly possible to account for Mathers' conduct in omitting to include in his schedule stock which was then worth over $30,000, pledged to secure an indebtedness of $12,000, and for his failure and that of his syndic to subsequently urge any claim to pledged property which finally reached the value of $177,000, on any other theory than that of a full acquiescence in the disposition made thereof.

As to other pertinent facts which are hotly contested between the parties, and as to which the evidence is conflicting, we have reached the following conclusions: Plaintiffs earnestly contend that the check of Palmer of $8850 could not, in law, be considered as a valid payment of the stock, even if he had had the capacity to become the purchaser thereof, which is denied.

That contention rests of the facts that E. C. Palmer was then the president of a bank tottering in insolvency, and that the firm of E. C. Palmer & Co., of which he was the senior member, was heavily indebted to the bank for overdrafts, and for indorsements held by the corporation. It is in this connection that plaintiffs have taken an immensely wide range in the matter of evidence, with the view to show that Palmer's check of $8850 against the pretended balance in his favor as a depositor was worthless, and particularly of no value to the bank, whose object in disposing of the lottery stock was to realize cash assets to meet the demands of its true creditors and bona fide depositors. Continuous efforts were made to show that Palmer was in truth a heavy debtor of the bank, whose valuable assets he had fraudulently absorbed; and a detailed history of all the transactions between Palmer and the bank, from the year 1872, to the date of its failure, in 1879, is to be found in the record, and has contributed its share to the innumerable

complications which teem in the record, and which we were expected to unravel and to solve.

But under a correct appreciation of the law which governs the case, the investigation of all these matters, which practically involve the administration of the bank, for several years, and its final liquidation, is entirely foreign to the real issues presented by the pleadings in this case.

We hold, in answer to the contention on this branch of the case, that Palmer's individual account as a depositor was entirely distinct from that of his firm, and that without his consent or special agreement, the debits of the firm could not be compensated or set off against the balance in his favor.

It is elementary in our jurisprudence that " the component parts of a firm are distinct beings from the firm, as well as from each other, and their rights and liabilities must be tested and adjudicated accordingly." Paradise vs. Groon, 32 Ann. 532, and authorities therein cited.

Hence flows the principle, equally well settled, that, " the lien and the right of set off exist only where the individual, who is both depositor and debtor, stands in both these characters alike in precisely the same relation and on precisely the same footing towards the bank. That is to say, for instance, the bank can claim no lien on the deposit of a partner, made on his separate account, in order to set off the same against a debt owing them from the firm, and this not even if property specially pledged to the bank by the partner on his separate account, afterwards becomes the property of the firm." Morse on Banks and Banking, p. 48.

In the case of Hancock vs. Citizens' Bank, 32 Ann. 590, this general rule was enforced in a case of peculiar hardship, and the doctrine was therein formulated thus : " Compensation does not take place in the confidential contracts arising from irregular deposits, such as the deposit of money with a banker, and the depository is not authorized to apply the funds on deposit in his hands to the payment of the debts of the depositor, except there is a special mandate from him." See also Gordon vs. Muchler, 34 Ann. 604.

Conceding, therefore, that Palmer might have been indebted to the bank, on account of his liability for the debts of his firm, it is clear that his indebtedness in that capacity could not have been set off against the balance in his favor on his account as an individual depositor.

We are not to be understood as deciding that after a thorough settlement of accounts between the bank and the firm, Palmer could have been held as a debtor on account of his firm ; we simply eliminate that

discussion as irrelevant to the cruicial test of his rights under well settled jurisprudence.

We, therefore, conclude and we hold that under the state of his account as a depositor in the bank on the 29th of May, 1879, Palmer had the undoubted right to draw a check of $8850 on the bank, and that such check was a legal payment to Mathers, Jr., for his stock. Hence, through that operation, the bank, as pledgee of that stock, obtained full and valid consideration for its interest in the same.

It is conceded that at that time, and for several months before, the stock could not have commanded a higher price on the market, and that the bank was bound, and the directors clamorous in their eagerness, to sell the stock. But it is contended that. Palmer's mode of selling defeated the very object contemplated by the resolution authorizing him to sell, and that under his management the bank did not receive as an asset the proceeds realized from the stock.

The record and the very equities of the case suggest two answers to that contention.

In the first place, Palmer being, as depositor, a creditor of the bank, could have drawn, on his account, the amount of $8850, which the stock sold for, and thus the same result would have been obtained in an indirect manner. And in the second place, the record shows that on the same day he placed in the coffers of the bank the sum of $9573 75, the amount of his loan from the People's Bank on the pledged stock.

It is difficult to conceive wherein the bank was injured by the transaction, and wherein she could have been benefitted by a restitution to her of the stock, on her restoring what she had received, if the stock had not appreciated in value, and much less if it had depreciated in the meantime.

Manifestly the bank could not reclaim the stock, because it had been illegally disposed of, without tendering the return of the consideration obtained therefor. Lacomb vs. Forstall, 123 U. S. p. 570.

It is doubtless in those or similar considerations that the silence of the bank directors, to whom the whole transaction was known, can and must find its reason.

They knew that the stock could not have commanded a better price, but that it might, on the contrary, have depreciated; they saw that the burdensome indebtedness of Mathers was reduced by $8850, and that the credit of Palmer as a depositor was reduced in the same proportion. Hence they formulated no complaint and urged no objection, and therefore they must be held in law as having ratified the disposition, as illegal as it may have been, made by their agent of their interest in the stock.

By their long inaction, Mathers the owner, and the bank, as pledgee of the stock, are silenced into a tacit acquiescence of Palmer's dealings touching the subject-matter.

Nothing is better settled in our minds, from the record, that if the stock in question had not increased in value from May to November, 1879, the present suit would never have been filed, and if the same stock had not met with such phenomenal increase of value from December, 1879, to February, 1887, the suit would have continued to slumber, as it had done for eight years, on the uncalled docket of the Civil District Court.

As the bank never was the owner of the stock, a serious question might be presented involving the right of plaintiffs to urge the nullity of the sale by Palmer to himself, when it is connected with the silence of Mathers, the owner.

But for the purpose of our disposition of the case we have conceded their right as well as their conclusion on that point, preferring to rest our decision on the ratification of the transaction by their silence with knowledge of the facts.

The principle which gives legal effect to acts of an agent unauthorized by, or in violation of, his mandate, in consequence of the silence or acquiescence of the principal is quite familiar in our jurisprudence.

In the case of Ward vs. Warfield, 3 Ann. 468, the agent to whom cotton had been consigned for sale in New Orleans, shipped it to Liverpool, where it was sold for account of his principal, at a price less than the market value of the cotton in New Orleans at the date of the shipment to Liverpool. The principal had been notified of the transaction and had been offered the option of accepting the risk of the venture, or of closing the sale with the agent at the stipulated market value of the cotton in New Orleans at the time. In the meantime the cotton market in Liverpool had depressed, and the cotton was sold there at a reduced price, resulting in a considerable loss from the amount of credits allowed to his principal by the agent, and suit was brought by the latter for the recovery of the difference between the credit thus given and the actual proceeds of the sale of the cotton.

The offer of the agent to take the cotton at its market value in New Orleans remained unanswered for one month, at the end of which time the principal answered that he accepted the offer of purchase by the agent.

But the court held the silence of the principle for one month to be equivalent to an acquiescence in the acts of the agent; and the latter recovered his demand.

The court said:

"The principle is well settled that the obligation of an agent whose authority is limited by instructions, is to adhere faithfully to those instructions. If he unneccessarily exceed his commission, he renders himself responsible to the principal for the consequence of his act. If loss ensue, it furnishes no defense to him that he intended the benefit of his principal. But while the general doctrine may be considered as unquestionable, there are other principles which are equally well settled in the law of agency. Subsequent assent, as between principal and agent, is equivalent to a previous authority, and hence, where an agent has committed a breach of orders, and the principal, with full knowledge of all the consequences adopts his acts, even for a moment, he will be bound by them and the agent will be discharged. Nor is it necessary that such assent should be express. It may be inferred from the conduct of the principal."

In the case of Lafitte et al vs. Godchaux, 35 Ann. 1161, this Court applied the doctrine under circumstances quite similar to the facts disclosed in the present case.

The pledgee of certain shares of insurance stock had reported to the pledgeor a sale thereof under the authority of the act of pledge, and claimed a balance due him on account of his note secured by the pledge, which the pledgeors made good. Subsequently the latter brought suit for the recovery of the stock, on the ground that the pledgee had not truly sold the stock but had detained the same for his own account.

While the court conceded that the sale made by the pledgee was a nullity, it rejected plaintiff's demand on the ground of his acquiescence resulting from long silence after full knowledge of the facts.

It was said in that case:

"In such a transaction the relation of the pledgee to the pledgeor is precisely that of an agent to his principal, and the validity of his acts must be tested under the same rules."

"Those rules are well known and firmly established in our jurisprudence, and they hold the acquiescence or long silence of the principal touching an unauthorized or illegal act of his agent as a ratification of the act or contract of the agent." See also: Allison & Co. vs. Watson, 36 Ann. 616; Bennett vs. Bank, 34 Ann. 150; Starr vs. Zacharie, 18 La. 517; Dupré vs. Splane, 16 La. 51.

The preponderance of the conflicting evidence on this point shows to our satisfaction that the directors of the bank who had authorized and directed the sale of the stock by Palmer as their agent, had full knowledge of the circumstances under which it was disposed of including the

fact that Palmer had taken it for his own account. Their functions as directors continued until the 30th of June, fully two months after the obnoxious transaction, and yet they did nothing indicating a repudiation of the acts of their alleged unfaithful agent. After the failure of the bank their functions were vested in the liquidating commissioners, the present plaintiffs, who avowedly obtained full knowledge of the transaction, and they remained silent until November following, when they began to complain, being prompted, not by the belief that the sale was a nullity *ab initio,* but by the prospects of gain as a result from the rapid increase in value of the stock, which had, in the meantime, doubled in value.

Their case must be held to fall fairly within the rule of acquiescence by long silence.

These considerations lead to, and fully justify the conclusion that when this suit was instituted Palmer was the true and legal owner of the stock pledged to the bank by Mathers, and that those who hold under him have acquired a good and indefeasible title to the same. We, therefore, hold that the judgment in favor of the defendants, Moore, Hyams & Co., and of the Louisiana Lottery Company, is correct, but that there is error in the judgment against E. C. Palmer.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be amended by reversing that portion of the judgment which condemns E. C. Palmer to pay to plaintiffs the sum of $18,580 with interest, and with a privilege on the forthcoming bond, and by rejecting plaintiff's demand against said Palmer. And it is ordered that as thus amended said judgment be affirmed at plaintiffs' costs in both courts.