**AMERICAN FIRE & MARINE INS. CO. v. SEYMOUR.** *

No. 4389.

Court of Appeal of Louisiana. Second Circuit.

Dec. 16, 1932.

Theus, Grisham, Davis & Leigh, of Monroe, for appellant.

Hudson, Potts, Bernstein & Sholars, of Monroe, for appellee.

McGREGOR, J.

In the month of July, 1930, the plaintiff appointed the defendant as its local agent in the city of Monroe to solicit and sell insurance of different kinds within certain limits and under certain restrictions. This appointment was made in person by Harry S. Kaufman, Jr., a member and officer of Harry S. Kaufman, Limited, of New Orleans, general agent of the plaintiff in Louisiana. All the details of "planting" the agency were completed before Mr. Kaufman left the city and all necessary stationery and supplies were left with the defendant. Among these supplies were twenty-four blank policies which were bound in a pad with a back or cover with printed instructions on the inside.

This inside page of the covering was filled with printed matter headed with the word "I–M–P–O–R–T–A–N–T," in large capital letters extending practically across the entire page. Beneath this head and covering nearly the entire page is a list of thirteen fire-theft risks and of forty-seven liability-property damages-collision risks, which the agent, defendant in this case, could not write "unless authorization in writing for so doing is first had from the Company." Underneath the entire list there is printed in bold blackface type the following paragraph:

"Do not bind the Company on any risks declined or cancelled by any other insurer un-

less specific authority in writing for so doing is first obtained from the Home Office."

Among the list of prohibited liability-property damage-collision risks appears: "Newspaper Delivery (not Magazine Delivery or rolls of paper used for newsprint)."

The Monroe Morning World had been carrying liability-property damage-collision insurance on its trucks that were being used daily for newspaper delivery throughout the territory surrounding the city of Monroe with the Maryland Insurance Company. This company was dissatisfied with this risk, and, on August 2, 1930, canceled out the insurance with the full knowledge of the defendant, and defendant immediately issued two policies of a similar nature on two of the said trucks without in any manner consulting the home office of the plaintiff or attempting to secure permission for the issuance of the said policies. These policies were handled by the defendant just as he handled all his business, though he may have deviated somewhat from what the strict rules of the company may have required.

On August 5, 1930, the Monroe Morning World suffered a collision loss on one of the trucks covered by the said policies, which loss was reported to the company's general agent at New Orleans on August 7, 1930. On August 12, 1930, there was a similar loss on the other truck, which was reported by the defendant to the company's general agent at New Orleans on the same day. In each case the report could not have reached the office of the general agent until the day following the day on which the report was made.

Knowledge of the issuance and delivery of the two policies did not reach the plaintiff's general agent until after the first loss and until about the time of the second loss. The reports of the two losses were handled in the usual way, and, as soon as the policies were examined in connection with the reports of the losses, it was discovered that they were in the class which defendant had no authority to write without special written authority from the home office at Galveston, Tex. A telegram ordering the immediate cancellation of the two policies was sent to the defendant on August 13, 1930, which was couched in the following language: "You have violated specific instructions and have thereby assumed personal liability in writing automobile insurance Monroe Morning World. Cancel policies immediately. Writing."

This telegram was followed by a letter of the same date which declined to order an adjustment of the losses under the two policies. The policies were, of course, canceled.

Plaintiff refused to pay the losses covered by the two policies, and, on or about April 15, 1931, the Morning World brought two suits against it and secured judgments aggregating the sum of $724.02, which was paid by the plaintiff on October 16, 1931.

On November 21, 1931, plaintiff filed this suit against the defendant to recover the said sum of $724.02 which it had been compelled to pay because of the issuance and delivery of the said policies, being the aggregate amount of the two judgments against it.

In its petition the plaintiff outlines the details of its connection with the defendant as its agent in Monroe, and specially alleges the fact that the printed instructions referred to above were placed in his hands and that special attention was called thereto. It then alleges the issuance and delivery of the two policies and that they covered risks that were specially prohibited in the said instructions and that, therefore, the defendant issued and delivered them not only without authority, but contrary to specific instructions given in advance.

It is then alleged that not only did the defendant have no authority to issue the policies, but that they could not have validly or legally been issued without the written authority and consent being first obtained from the home office at Galveston, Tex., and that no such authority was asked for or given, and that therefore the policies were issued in direct violation of the instructions given by the plaintiff to the defendant.

In his answer to plaintiff's petition the defendant admitted practically all the material allegations relative to the issuance and delivery of the policies and the losses incurred thereunder, but pleaded that in issuing the policies he acted within his authority. He pleaded further that the plaintiff made no complaint in regard to the said policies until August 13, 1930, after both losses had occurred on August 5 and 12, 1930, respectively, and that therefore it was estopped from setting up any want of authority in the defendant to issue the said policies.

It is the contention of the defendant that, prior to his appointment as agent for the plaintiff, he advised its representative who appointed him that he desired to write these very policies now in dispute and that this fact was the moving cause of his accepting the agency, and that this said representative, with full knowledge of the kind and character of the risks, then and there stated that they were acceptable and consented on behalf of the plaintiff that the policies be issued.

On the issues as thus made up the case was tried, and judgment was rendered in favor of the plaintiff as prayed for. From that judgment the defendant has appealed.

Before arguing his appeal on the merits in this court, the defendant filed an exception of no cause of action based on the following allegation: "That this is a suit brought by a foreign Insurance Company against its local agent to recover for an alleged violation of instructions, in that the said local agent failed to obtain the written consent of the plaintiff company before writing certain poli-

cies of insurance. That there is no allegation or proof that the said Insurance Company would have refused to have given the said local agent written authority, and accordingly, the plaintiff fails to show that the violation of said instructions was the cause of the damage herein sued upon, and accordingly, shows no cause of action."

On the Exception of No Cause of Action.

█ The exception of no cause of action is leveled at the fact that there is no allegation or proof that the plaintiff would have refused to give the defendant written authority to write the disputed policies if he had asked for this authority in accordance with the printed instructions given to him. In deciding this exception, we consider not only the pleadings, but all the evidence.

In paragraph 11 of the petition it is alleged that the Monroe Morning World had been carrying insurance on the two trucks in question with the Maryland Insurance Company and that this company, because of its conclusion that the risks were undesirable, canceled its policies on the same day on which defendant issued plaintiff's policies, and that this cancellation was made with the knowledge of and in co-operation with the defendant, and that all this was done in direct contravention of the prohibition contained in the printed instructions. Those instructions provide that, when any risk has been canceled by any other insurer, plaintiff's agents are prohibited from issuing a policy covering it unless specific authority in writing for so doing is first obtained from the home office.

It is admitted that the trucks insured were used only for newspaper delivery and that they fall within the prohibited risks in the printed instructions.

In paragraph 14 of plaintiff's petition it is specially alleged that the policies in question could not have been issued without the written authority and consent being first obtained from the home office, and that no such authority was asked for or given.

In answer to the allegations of paragraph 11 of the petition, the defendant avers that all facts relative to the coverage of the trucks were communicated to the plaintiff's representative at the time of the "planting" of the agency and that he then and there consented in advance to the issuance of the policies. In answer to the allegations of paragraph 14 of the petition, the defendant avers that express permission to issue the policies was given by the representative of the plaintiff company who appointed him as agent, and that, if he did not have actual authority to give this consent, he was clothed with apparent authority to do so.

At the trial of the case the defendant testified to facts that strictly substantiate his allegation of defense. But Harry S. Kaufman, Jr., the representative who conducted the negotiations for and "planted" the agency in the office of the defendant, denied emphatically that he ever pretended to give the consent and authority as contended by the defendant. On the contrary, he testified that he actually delivered the printed instructions in person to the defendant and that he called his special attention to the prohibited risks. He admitted that the Morning World trucks were mentioned, but he states that he reminded the defendant at the time that written authority from the home office was necessary in order to cover them with insurance in the plaintiff company, and that he, himself, had no authority to grant the authority.

█ Defendant naturally admits as a matter of course that he made no request for and received no written authority for the issuance of the policies. He maintains that the requirement for written authority was waived and met by the oral authorization which he claims was given by Harry S. Kaufman, Jr., plaintiff's agent and representative, and that therefore it was no longer necessary to secure the written authority required under the printed instructions delivered to him. When he raised this issue and assumed this position, the question as to whether written authority would have been granted or refused if it had been properly asked for was eliminated and was no longer an issue in the case. The plaintiff says no written authority was asked for or granted and that therefore the policies issued contrary to instructions and that the defendant is personally liable for any loss sustained by it thereunder. The defendant, on the other hand, admits that no written authority was asked for or granted, but he then avers that authority was actually granted by the plaintiff's representative, clothed with apparent authority to do so, and that it was not therefore necessary to ask for this written authority. Since defendant assumed that it was not necessary to ask for the written authority as he had, according to his theory, authority already from the plaintiff's representative, he cannot then be heard to allege or prove in defense of his action that, if he had asked for written authority, it would have been granted, and, since this is true, it is not required of the plaintiff to negative this defense by allegation.

The exception of no cause of action is not well founded and is therefore overruled.

On the Merits.

In their brief counsel for defendant and appellant base their plea for a reversal of the judgment of the lower court on four grounds, viz.: (1) That the defendant had no knowledge of the restricted classes of risks; (2) that plaintiff's representative who "planted" the agency in defendant's office had authority to waive the written authorization, and, in the alternative, that he had the apparent

authority; (3) that plaintiff, through its general agent, ratified the issuance of the policies in question; (4) that plaintiff is estopped by failure to notify defendant in proper time that the policies should be canceled.

◼◼ Nowhere in their brief do counsel for the appellant discuss the question of the liability of an insurance agent for the loss incurred by an insurance company through the unauthorized issuance of a policy by the agent. We presume that liability is conceded in such a case. Counsel for plaintiff discusses this question in a most illuminating manner in their brief, but since the point appears to be conceded, and, since the question of the liability of an agent for an unauthorized issuance is so elemental, we refrain from any discussion or further reference to that feature of the case. The defendant in this case must be an experienced insurance agent. He is bound to be acquainted with all the detail workings of the business. He admits that, when the plaintiff's representative appointed him as agent, he delivered to him a pad of blank policies, including the back or cover which is headed in large capital blackface type, "I–M–P–O–R–T–A–N–T." Underneath that word there is a long list of risks that cannot, under any circumstances, be written without written authority from the company. Among the lists referred to is included the identical risk involved in this controversy. Then, near the bottom of the page there is a statement in bold blackface type to the effect that the agent has no authority to issue insurance on any risk that has been declined or canceled by any other company unless specific authority in writing is first obtained from the home office.

◼ Defendant claims that he was ignorant and had no knowledge of the subject matter of the restriction contained on this page headed "I–M–P–O–R–T–A–N–T." He admits receiving it from Kaufman, but denies ever having read anything on it. In reply to a question on that point, he says: "No, sir, I never looked on the inside of the folder. I doubt if we ever look on the inside of any of them. No reason to look on the inside of them." This answer cannot excuse him. That printed matter was not placed there without a reason. It was highly important to all parties concerned as it limited the authority of the defendant. While the defendant was testifying as a witness in his own behalf, his counsel propounded to him the following interrogatory: "Mr. Seymour, what if any instructions or advice was given you as to whom you were to receive instructions from,—by Mr. Kaufman, if any such instructions were given?"

The testimony sought to be elicited by this question was objected to by counsel for the plaintiff as an attempt to vary and alter the written instructions, and for the further reason that it would be ex parte and not binding on the plaintiff if any were given. The objection was sustained and the defendant was not permitted to answer. Because of this refusal to receive this testimony, counsel for defendant urges that the case should be remanded in order to permit the defendant to give testimony along this line in order to justify him in issuing the policies. It is presumed that it was sought to show that Kaufman, the representative, told the defendant that he had authority to issue instructions and that he did issue instructions authorizing the issuance of the policies in question. Even if he had been permitted to answer the question and even if he had testified that Kaufman did tell him he would be the source of all instructions, and even if he had testified that then and there Kaufman pretended and attempted to authorize the issuance of the policies, that would not have been binding on the plaintiff. Kaufman could not orally change the written and printed instructions that he delivered to the defendant.

It is no excuse that the defendant did not read the instructions. He is bound by them absolutely. Frequently the courts have to pass upon verbal promises made by agents in the sale of goods that are directly contrary to the written terms of sale contained in a regular contract. It is the unbending rule of the court not to excuse one from the performance of obligations of the plain provisions of a contract because of different oral representations of an agent. Complaint is made that defendant was refused the right even to deny that these instructions were shown to him. He could not be heard to deny this. He admitted getting them and it was his duty to read them. It is more than likely he knew the contents without reading them, as most companies have about the same general line of instruction and an experienced insurance agent like the defendant should be familiar with them. He certainly should have known the importance of reading everything in connection with the pad of supplies. The objection to the testimony was properly sustained and defendant cannot be heard to urge as a defense that he had no knowledge of the restrictions contained in the instructions which he received.

Next the defendant urges that Kaufman had the authority to waive the written authorization, and, as a matter of fact, did so waive it, and that, if he did not have such authority in fact, he did have the apparent authority. We have read and reread the testimony very carefully on this subject and we have failed to find any evidence to substantiate this defense. It is stated that defendant had no way of ascertaining whether Kaufman had such authority. Kaufman himself said emphatically that he could not have. assured the defendant that he could and

would authorize him to write the policies. He said: "I could not do that. We, as general agents, have no authority to cover such risks and are bound by the same prohibition."

At the same time he said: "And I went on to explain that as general agent we are bound by the same prohibition as the local agent— by the same prohibitions appearing on the pad of policies, and I couldn't authorize him. I had no authority to write one myself, even in my local agency at New Orleans."

■ Testimony could not be stronger. Even though defendant had been permitted to show by other witnesses that Kaufman, on other occasions, had pretended to waive this written authority, it could not have changed the situation. The printed instructions are absolutely binding and cannot be varied by instructions of any agent outside of the home office. We see no foundation for the defense that Kaufman had any apparent authority to waive any instruction. If he had such authority, it is not apparent but so obscure that it has not been revealed.

■■ The next two defenses may be combined and treated as one. It is contended that the plaintiff, through its general agent, Kaufman, ratified the issuance of the policies and that it is therefore estopped by its failure to notify defendant in proper time that the policies should be canceled. In support of this contention it is urged that the daily reports covering the issuance of these policies reached the office of plaintiff's general agent, Kaufman, in New Orleans on August 9th, four days after the first loss and three days before the second. It is contended that on August 9th, immediate notice should have been given, and that, since the policies were not canceled instanter, they were considered as ratified. Even so, in any event that could not affect the first policy for the loss had already taken place. In support of his contention, defendant cites the case of Gitz Sash Factory v. Union Insurance Soc., 160 La. 381, 107 So. 232. The situation in that case is entirely different from this, and the contest was between the insured and the insurer. The policy was issued on November 10, 1920, and the loss was incurred on April 23, 1921, several months afterwards. If there was any objection to the policy in that case there was ample time in which to discover it. In the case now under consideration it took the simple notice of the issuance of the policies from the second to the ninth of the month to reach plaintiff's general agent. Naturally it requires a great deal of routine to check and double check these policies when they come into the general office of the agency from all the territory covered by the agency. And before sufficient time had elapsed for it to be discovered that the policies covered prohibited risks,

the second loss occurred. Furthermore, in the cited case the liability of a local agent writing and issuing policies without proper authorization is not involved. That case was good authority in the two suits of the Morning World against the plaintiff, and it is because of the fact that defendant had placed the plaintiff in position to be held liable in a case where it had not authorized the defendant to bind it that plaintiff is now seeking to recover from the defendant the amount which it had to pay under the said policies.

Defendant had the apparent authority to issue the policies and therefore the plaintiff was bound, but the question involved in this case is as to whether the plaintiff can recover from the defendant on account of his authority being only apparent but not in fact real. Ample time had not elapsed for the plaintiff to ratify the policies, so this feature of the defense must also fail.

Since there had been no opportunity to ratify the policies, and since they were not ratified in fact, wherein has the plaintiff estopped itself from seeking to recover its loss from its agent who bound it and incurred the liability without authority, which, under the plain letter of the printed instructions, had to be in writing from the home office?

■ It is well settled that the law does not favor estoppels. In the case cited above it was held that the insurer was estopped from contesting the payment of the loss to the insured. The insured had relied upon the insurance for several months and had been lulled into a sense of security. It had done nothing but receive the policy from the agent. If it had known that the policy would be contested in case of loss, it could have taken steps to protect itself, but wherein does that line of reasoning apply to this case? He had done a wrongful act. He had violated the plain letter of printed instructions and thereby had caused this principal to suffer loss. Shall a plaintiff be estopped because it did not have opportunity to discover the defendant's violation of its instructions until after the loss had been incurred? To ask the question is to answer it. To hold otherwise would be equal to approving the plea of estoppel against the consequence of one's own wrongdoing, a thing that is abhorrent to all the rules and principles of equity. Besides, in order for the defendant to avail himself of the doctrine of estoppel in this case he must show that by plaintiff's failure to repudiate these policies sooner than it did he was misled, or that he assumed a position different from the one he would have assumed. In the very nature of the case this cannot be true here. The only difference that an earlier repudiation could have made would have been the averting of the loss entirely if notice of their issuance had been brought to the attention of plaintiff earlier, in time for the repudiation to have been made

before the losses occurred, but that was not done, and it was through no fault of the plaintiff, but through the sole and only fault of the defendant.

For the reasons assigned, the judgment appealed from is affirmed, with the costs of both courts to be paid by the defendant and appellant.