MANUFACTURERS CASUALTY INSURANCE COMPANY, Appellant,

v.

MARTIN–LEBRETON INSURANCE AGENCY, Appellee.

No. 16367.

United States Court of Appeals
Fifth Circuit.

March 28, 1957.

Rehearing Denied June 14, 1957.

Parnell J. Hyland, William A. Porteous, Jr., Porteous & Johnson, New Orleans, La., for plaintiff-appellant.

Frank S. Normann, Normann & Normann, New Orleans, La., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

HUTCHESON, Chief Judge.

Appealing from a summary judgment dismissing, for the reasons stated in the

opinion,[1] its action to recover damages for loss caused by the unauthorized act of the agent in executing a building performance bond, plaintiff is here insisting that the judgment should be reversed because the case was not one for summary judgment but for trial, and because, if the case was one for summary judgment, the judgment should have been for plaintiff.

The facts [2] insofar as shown, are simple. The law is equally so.

The district judge, stating: "The defendant agency admits that the bond was executed without authority. It argues that, in the state of the relationship between the parties, at the very least the insurer owed it a duty to disavow its action immediately if the insurer intended to do so, in order that the agency could seek another bond to substitute for the one in suit."; held that the defendant was right because, where an agent exceeds its authority, the principal must, to hold him accountable, immediately upon notice repudiate the agent's action. Otherwise, the principal is deemed to have ratified his agent's act, and "where, as here, repudiation by the principal may be unavailing as to third parties and the agent is sought to be held personally accountable, there still arises the duty immediately to notify the agent of disavowal so that he may protect himself if he can."

Proceeding, then, on the motion for summary judgment, to treat the case as though it presented no issue of fact, the

1. Manufacturers Cas. Ins. Co. v. Martin Lebreton Insurance Agency, 144 F.Supp. 515.

2. On June 18, 1948, defendant became the agent for complainant under an agency agreement which provided among other things: "The agent shall in no case obligate the company except within the limitations in the instructions issued by the company. * * * Agent agrees to keep and observe with all fidelity to company all instructions by it to agent."

The agent had no authority to write contract performance bonds or bonds of any sort.

On Jan. 12, 1951, agent, desiring to write bonds for one Geiger, who it advised "has been recommended to us— Dun and Bradstreet have no information on him", requested, by night letter, wire authorization to execute a bond on a small painting job for $2,780 and temporary authorization to write other bonds for him, pending "your complete investigation".

On the same day the plaintiff sent a telegram to the defendant reading as follows: "Prefer not to authorize painting bond James H. Geiger without full investigation. Writing".

On the same date plaintiff wrote to the defendant expressing lack of confidence in Geiger as a credit risk on the basis of inability to find anything about him, and stating, "We do not feel that we should authorize this bond until such time as the completed financial statement is forwarded to us by Mr. Geiger". It also requested other and full information about him.

Under date of Jan. 23, 1951, plaintiff sent a wire authorizing the $2,780 bond and on the same day this authority was confirmed in a letter to the agent in which insurer wrote, "In regard to the bond of approximately $13,800 for Mr. Geiger [which plaintiff had requested authority to write], we wish to advise that as soon as you know the other bids, we wish that you would let us know immediately and we will see what we can do toward authorizing this bond."

In the face of this correspondence and plaintiff's specific refusal to authorize the execution of the bond, the defendant, on Jan. 25, 1951, without any authority to do so, signed the bond, and on Jan. 29, placed the contract and the bond on record in the mortgage office.

Defendant, however, was not advised of the execution until Feb. 3, 1951. The remittance by the agent for premiums written in the month of January was not made until well into March, the execution report is not dated, the check is dated March 8, and it was deposited on March 13, 1951.

On March 16, the defendant wrote to the claim department of plaintiff, advising that there was evidence of a possible loss under the bond.

On March 21, Mr. Cordell, Vice-President of plaintiff, wrote it expressing surprise that it had executed the bond in violation of its express authority and advising that it would hold the agent liable for any loss sustained.

The insurance company thereafter completed the contract, the agent under a disclaimer of personal liability on the bond cooperating fully with the insurer in completing it.

court found that the agent had acted in good faith, that the insurer had not acted promptly enough to disavow the agent's authority to act, and that, through its inaction, it had prejudiced the position of its agent and was, therefore, estopped to make any claim over against the agent for the loss on its bond.

We cannot agree with these views. The law is well settled: that an agent owes to his principal the obligation of high fidelity; that he may not proceed without, or beyond, his authority, particularly where he has been forbidden to act; and that, if so proceeding, his actions cause loss to the principal, the agent is fully accountable to the principal therefor.

"* * * An elementary factor in the principal-agent relationship is control. As stated in I Restatement, Agency, § 14, p. 47: 'A principal has the right to control the conduct of the agent with respect to matters entrusted to him.'" Ledbetter v. Farmers Bank & Trust Co., 4 Cir., 142 F.2d 147, at page 150.

This court has had occasion many times to deal with suits against agents for failure to obey instructions. In Blackshear Mfg. Co. v. Umatilla Fruit Co., 5 Cir., 48 F.2d 174, 175, a suit for negligence and bad faith of a salesman in extending credit, this court, holding that the evidence was sufficient to take the question to the jury, declared:

"The law exacts of every agent and employee diligence, good faith, and obedience to instructions in the execution of his agency or employment, and holds him liable for failures therein that occasion damage."

In Eagle Indemnity Co. v. Cherry, 5 Cir., 182 F.2d 298, 299, the court declared:

"It is fundamental law that an agent bears a fiduciary relationship to his principal, and owes him the duty of good faith and loyalty. 2 Am.Jur., 202, Sections 251, 261, and 268. By virtue of this relationship, no agent is entitled to take any un-

fair advantage that his position may offer him to profit, at his employer's expense, beyond the agreed compensation for his services."

In Palmer v. Chamberlin, 5 Cir., 191 F.2d 532, 538, 27 A.L.R.2d 416, this court again declared:

"Likewise, 'An agent is a fiduciary with respect to the matters within the scope of his agency.' 2 Am. Juris Agency, Sec. 252."

Finally, in Canada Steamship Lines v. Inland Waterways Corp., 5 Cir., 166 F.2d 57, 59, a suit brought in Louisiana by a principal against his agent for damages for failure to follow his instructions, this court, holding the agent liable, discussed fully the principles controlling in suits between principal and agent of the kind presented here. There, stating:

"The general principles of the law of agency as they apply here, are not in confusion. They may be found set down in Am.Jur., 'Agency', Secs. 251–278. They leave in no doubt that where, as here, an agent has been given general instructions to clear a shipment, which instructions could be carried out in the interest of the principal without incurring duty, if the agent, without returning for more specific instructions, assumes to take a course in carrying the instructions out which subjects the shipment to duty, the agent, and *not the principal*, must bear the loss."

we gave full application to these principles.

Under the undisputed facts in this case and the settled law applicable thereto, unless and until the principal, with full knowledge of all the applicable facts, waived the breach of his instructions and adopted the agent's act, in writing the bond, as its own, the agent became and remained liable to the principal for the damages resulting from its assuming to act to the disadvantage of its principal without authority and in absence of clear proof of facts showing breach of instructions. In short, in the

an express and knowing adoption of the agent's act as its own, or otherwise raising an estoppel against the defendant to assert the admitted breaches of the agent's obligations as a fiduciary, the matters stands, as it stood in the Canada Steamship Line case, supra, where this court said of an agent:

> "Defendant, acting precipitately and unreasonably, and without authority, incurred the duty [here the loss]. It, and not plaintiff, should pay it."

The case was not tried and determined on its facts. Instead, it was determined as matter of law and without a trial on the incorrect assumption that, notwithstanding the agent's admitted and grievous breach of its duty, it could escape the loss and throw it on its principal, *upon the mere claim that the principal did not immediately repudiate the bond.* The law is not so written.

The judgment is reversed and the cause is remanded for trial and for further proceedings not inconsistent herewith.

RIVES, Circuit Judge (dissenting).

The sole and simple issue in the district court was whether the principal, Manufacturers Casualty Insurance Company, as between itself and its local agent in New Orleans, ratified the act of the agent in writing a contract performance bond. There was no claim that the agent had original authority to write such a bond.

On January 12, 1951 the agent sent a night letter telegram to the principal advising that one Geiger was the successful bidder on "a small painting job for $2780," giving a brief summary of Geiger's experience, assets and liabilities and requesting authority to execute the bond. On the same day the agent wrote the principal an air mail special delivery letter giving additional information about Geiger, and concluding:

> "Mr. Geiger, I am quite sure will be formally awarded the contract referred to in my letter of $2,780.00 on Monday and he has a bid out of

$13,800.00 on which there is a possibility he may also be awarded that contract. This makes a total of $16,580.00.

> "We would like to get this man started and in the light of this additional information which I have developed for you I would appreciate your letting us have authorization by wire."

Still on the same date, January 12th, the principal wired the agent: "Prefer not to authorize painting bond James H. Geiger without full investigation. Writing."

The principal's letter of the same date to the agent read:

> "Re: James H. Geiger, d/b/a Bennette's Contracting Co. Painting Job approximately $2780.
>
> \* \* \* \* \* \*
>
> "Immediately upon receipt of your night letter we wired you stating that we preferred not to authorize this job without full investigation. We know nothing whatsoever of Mr. Geiger and upon looking over the Dun & Bradstreet book for January of this year, we cannot find that he is even listed personally; neither is the Bennette Contracting Company. While we have no doubt the statement which you have made in this night letter is correct, we still do not feel that we should authorize this bond until such time as a completed financial statement is forwarded to us by Mr. Geiger. We also would like the names of the supply houses from whom he makes his purchases and verification of the cash in bank. As soon as these papers are submitted we will be very glad to commence our investigation and, if satisfactory, will see what we can do towards giving you authority to execute bonds for this concern.

> "In your night letter you state he has Accounts Receivable of $1400. As no information is given as to these Accounts Receivable, we are

wondering if perchance they might be some receivables from some small painting jobs which he has already done.

"Please forward the necessary papers immediately and we will do the best we can for you for this concern."

So far as the present record shows, the next communication was on January 23rd, when the principal wired the agent: "Authorize contract bond two thousand seven hundred eighty dollars James H. Geiger—"

Also on January 23rd, the principal wrote a letter to the agent as follows:

"This will confirm our wire authorizing you to execute a bond for James H. Geiger covering a contract of approximately $2780. In regard to the bond of approximately $13,-800. for Mr. Geiger we wish to advise that as soon as you know the other bids we wish that you would let us know immediately and we will see what we can do toward authorizing this bond."

On the next day, January 24th, the agent wrote to the principal:

"Gentlemen:

"Re: J. H. Geiger

"Thank you for your authorization in connection with the above case authorizing the execution of the bond for $2,780.00. We are sorry that we had to rush you so much in this case, particularly since nothing has happened as of this day. However, we expect both the $2,780.-00 and the $13,800.00 to break momentarily. We assume that it is in order to execute bonds covering both contracts should we be called upon to do so.

"Our principal as previously explained will not undertake any other job until these are completed."

On the next day, January 25th, both bonds were executed by the agent in the name of the principal, and on January 29th, the contracts and the contract performance bonds were placed on record in the Mortgage Office for the Parish of Orleans. Thereafter, on January 30th, the principal wired the agent: "Do not execute bond J. H. Geiger thirteen thousand eight hundred unless authorized see letter January twenty third—"

On February 3rd, the agent wrote the principal:

"Re: James H. Geiger—your letter of January 23, 1951.

\* \* \* \* \* \*

"As to James H. Geiger, we executed the bond authorized in the sum of $2780.00 and he was also awarded the contract which we discussed over the telephone for $13,-800.00. He was low bidder by $1560.00. The $13,800.00 case and the $2780.00 broke simultaneously. Mr. Geiger called very early on the morning of January 25, 1951 and asked me to meet him in the notary's office at 9:30 a. m., which I did, and we executed both bonds since his bid was in line.

"As previously explained, Mr. Geiger was well recommended by the people we contacted as to honesty, integrity, and ability, with the further fact that he has handled like jobs of this size and larger before.

"The delay in corresponding with you was due to the fact that I was waiting for a copy of the contract from the Orleans Parish School Board's notary in order that we may furnish you with all pertinent papers at one time.

"I feel sure that if you and your underwriting committee look at this case from an objective point of view, you will concur with the actions already taken."

So far as the record shows, there were no further communications between the principal and agent for more than a month. On March 8th, the agent forwarded to the principal its regular reports covering insurance and bonds written by it during the month of January, enclosing with said reports the principal's portion of the premiums in the

amount of $208.49. The premium for the $13,800 was listed in the reports as "Policy No. 42699, Assured—Bennettes Contr. Co., 30% Bonds 138.00, Contr. gem, Total Premium 138.00." The check was deposited by the principal on March 13, 1951, and is still retained by it.

On March 16th, the agent wrote to the claim department of the principal:

"Re: Bond No. 42699—Manufac-
turers—Bennette's Contract-
ing Company

"I know that you will sustain a loss under the above captioned. We have not been notified officially or unofficially. However, there is mounting evidence at this time to justify my opinion.

"Kindly let us or your attorney have your instructions as the specifications provide that the Surety has only ten (10) days to act once they are officially notified.

"Through our contracting connection, I believe we can minimize the loss and you may rely upon us for our utmost cooperation."

The agent's previous communications had been directed to the Superintendent of the Contract Department of the principal at the same address, 1617 Pennsylvania Boulevard, Philadelphia, Pennsylvania.

On March 21st, the vice-president of the principal wrote the agent:

"Re: Bond 42699—James H. Gei-
ger dba Bennette's Contract-
ing Co.

"We are indeed surprised to receive execution report from your office advising that you had executed the above captioned bond in the amount of $13,800. for James H. Geiger, doing business as Bennette's Contracting Company, for waterproofing exterior of Warren Easton High School, New Orleans, La., without having authority from this office for the execution of the bond.

"Your files will clearly indicate we did not authorize execution of this bond and in fact we wrote you on January 23rd advising that we were not authorizing the bond. We also wired you on January 30th not to execute this bond.

"At the time power of attorney was given you we issued to you underwriting instructions, by the terms of which you agreed to submit all contract bonds to this office for approval before execution. We have copy of Limitations of Authority signed by both G. E. Martin and Edward F. Lebreton, Jr.

"Since you have violated your underwriting instructions and agreement in connection with the issuance of this bond, we will expect to hold you responsible for any loss which we may sustain by reason of the execution of this bond in violation of your authority."

Upon the default of the contractor, Geiger, the principal took over the work, enlisted the aid of its agent in securing bids from other contractors, and the agent, under a disclaimer of personal liability, co-operated with the principal in completing the contract.

Under the foregoing undisputed facts, the learned district judge, in a clear and full opinion reported as Manufacturers Casualty Insurance Co. v. Martin-Lebreton Insurance Co., 144 F.Supp. 515, held that as between the principal and the agent, the principal had ratified the act of the agent.

I think that the district judge was correct. As said in I Restatement, Agency § 94, p. 234:

"*An affirmance of an unauthorized transaction may be inferred from a failure to repudiate it.*

"*Comment:*

"a. Silence under such circumstances that, according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent, is evidence from which assent may be inferred. * * * Whether or not such an inference is to be drawn is

a question for the jury, unless the case is so clear that reasonable men could come to but one conclusion."

See also 2 Am.Jur., Agency, §§ 232, 233.

That this principle applies as between principal and agent is made plain by the opinion of the district court, see 144 F.Supp. at page 517. If further Louisiana authority to that effect is needed, I would cite: Dupré v. Splane, 16 La. 51; Starr v. Zacharie, 18 La. 517; Reed v. Ritchey, 2 La.Ann. 796; Stanfield v. Tucker, 4 La.Ann. 413; Beau v. Drew, 15 La.Ann. 461; Featherston v. Graham, 17 La.Ann. 42; Raymond v. Palmer, 41 La.Ann. 425, 6 So. 692, 17 Am.St.Rep. 398. In the last cited case, the Supreme Court of Louisiana said:

"The principle which gives legal effect to acts of an agent unauthorized by, or in violation of, his mandate, in consequence of the silence or acquiescence of the principal, is quite familiar in our jurisprudence. In the case of Ward v. Warfield, 3 La.Ann. 468, the agent, to whom cotton had been consigned for sale in New Orleans, shipped it to Liverpool, where it was sold, for account of his principal, at a price less than the market value of the cotton in New Orleans at the date of the shipment to Liverpool. The principal had been notified of the transaction, and had been offered the option of accepting the risk of the venture, or of closing the sale with the agent at the stipulated market value of the cotton in New Orleans at the time. In the meantime the cotton market in Liverpool had depressed, and the cotton was sold there at a reduced price, resulting in a considerable loss from the amount of credits allowed to his principal by the agent; and suit was brought by the latter for the recovery of the difference between the credit thus given and the actual proceeds of the sale of the cotton. The offer of the agent to take the cotton at its market value in New Orleans remained unanswered for one month, at the end of which time the principal answered that he accepted the offer of purchase by the agent. But the court held the silence of the principal for one month to be equivalent to an acquiescence in the acts of the agent; and the latter recovered his demand. The court said: 'The principle is well settled that the obligation of an agent, whose authority is limited by instructions, is to adhere faithfully to those instructions. If he unnecessarily exceed his commission, or risk his principal's effects without authority, he renders himself responsible to the principal for the consequences of his act. If loss ensue, it furnishes no defense to him that he intended the benefit of his principal. But, while this general doctrine may be considered as unquestionable, there are other principles which are equally well settled in the law of agency. Subsequent assent, as between principal and agent, is equivalent to a previous authority; and hence, where an agent has committed a breach of orders, and the principal, with full knowledge of all the consequences, adopts his acts, even for a moment, he will be bound by them, and the agent will be discharged. Nor is it necessary that such assent should be express. It may be inferred from the conduct of the principal.'

"In the case of Lafitte v. Godchaux, 35 La.Ann. 1161, this court applied the doctrine under circumstances quite similar to the facts disclosed in the present case. The pledgee of certain shares of insurance stock had reported to the pledgeor a sale thereof, under the authority of the act of pledge, and claimed a balance due him on account of his note secured by the pledge, which the pledgeors made good. Subsequently, the latter brought suit for the recovery of the stock, on the ground that the pledgee had not truly sold the stock, but had

detained the same for his own account. While the court conceded that the sale made by the pledgee was a nullity, it rejected plaintiff's demand, on the ground of his acquiescence, resulting from long silence after full knowledge of the facts. It was said in that case: 'In such a transaction the relation of the pledgee to the pledgeor is precisely that of an agent to his principal, and the validity of his acts must be tested under the same rules. Those rules are well known and firmly established in our jurisprudence; and they hold the acquiescence or long silence of the principal touching an unauthorized or illegal act of his agent as a ratification of the act or contract of the agent.' See, also, Allison v. Watson, 36 La.Ann. 616; Bennett v. [Mechanics' & Traders'] Bank, 34 La.Ann. 150; Starr v. Zacharie, 18 La. 517; Dupré v. Splane, 16 La. 51." Raymond v. Palmer, 6 So. 692, 695, 696.

In the case principally relied on by the principal, American Fire & Marine Insurance Co. v. Seymour, La.App., 144 So. 775, it was held that casualty insurance policies issued by the local agent without actual authority were not ratified because the insurer failed to cancel them within *three days* after notice of issuance reached the general agent's office.

In the present case, the principal waited from shortly after February 3 until March 21st, or for *more than forty days,* with no answer to the agent's letter of February 3rd, which, especially in view of the previous correspondence, plainly called for a reply if the principal did not intend to ratify the agent's act. In the meantime, the principal had received, deposited and still retains the premium for the bond. That seems to me inconsistent with its contention that the risk of loss was primarily that of its agent. Not until the agent had notified the principal of the certainty of a loss under the bond, did the principal break its silence, refer to the agent's original and admitted lack of authority, and seek to hold the agent personally responsible. That will not do.

Principals are under just as much obligation to deal honestly with their agents as agents are with their principals. It seems to me that simple honesty of dealings between the parties requires an affirmance of this judgment. I, therefore, respectfully dissent.

Rehearing denied; RIVES, Circuit Judge, dissenting.